Martin C. **SCHWARTZBERG**, Plaintiff,

v.

**CRITEF ASSOCIATES LIMITED PARTNERSHIP and CRITEF III Associates Limited Partnership, Delaware limited partnerships, Defendants.**

**Civil Action No. 14837.**

Court of Chancery of Delaware,
New Castle County.

Submitted: March 6, 1996.
Decided: June 7, 1996.

---

Richard D. Allen, William M. Lafferty and Justin M. Miller, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Plaintiff.

R. Franklin Balotti, Allen M. Terrell, Jr. and Robert J. Stearn, Jr., of Richards, Layton & Finger, Wilmington, of counsel: Deborah L. Thaxter and Sigmund J. Roos, of Peabody & Brown, Boston, MA, for Defendants.

## OPINION

ALLEN, Chancellor.

In this action Martin Schwartzberg seeks from defendants CRITEF Associates Limited Partnership and CRITEF III Associates Limited Partnership ("the Partnerships") access to certain business records. Mr. Schwartzberg is a limited partner of both entities and at least in name, a general partner of CRITEF Associates. The sole function of both CRITEF Associates and CRITEF III Associates is to serve as the general partner of two limited partnerships, CRITEF and CRITEF III, respectively ("the Funds"). The Funds in essence act as financial intermediaries, raising funds publicly through the distribution of Beneficial Assignee Certificates ("BACS") and investing the proceeds in tax exempt bonds secured by mortgages on multifamily housing properties.

Specifically in this suit Mr. Schwartzberg seeks from the Partnerships a list of registered holders of BACS issued by the Funds. The Partnerships as managing general part-

ners of the Funds are each said to hold these lists in their possession. Mr. Schwartzberg seeks as well certain financial records concerning the underlying properties securing the bonds held by the Funds. Plaintiff says he seeks this information 1) in order to evaluate the fairness of a pending transaction in which, if approved by the BACS holders, the Funds will be merged into another entity and the BACS will be cashed out and 2) in order to solicit the holders of BACS to replace the Partnerships as general partners (in fact to install himself as managing general partner).

In early February 1996, plaintiff sent letters to the Partnerships demanding access to this information. His requests were denied and he initiated this litigation on February 15, 1996. The action was tried on March 6 and 7, 1996.

Under the circumstances presented, I find that Mr. Schwartzberg's stated purpose for wanting access to the information he requests—to solicit the BAC holders to replace the Partnerships as general partners of the Funds—is a purpose fundamentally and importantly in conflict with the interests of the Partnerships and is an improper purpose from the point of view of the Partnerships. Thus whether sought in his capacity as a limited partner of both Partnerships or as a formal general partner of one of them, I conclude for the reasons set forth below that the relief sought must be denied.

## I. Facts

Following are the facts as I find them based upon a preponderance of the evidence in the record. Because allegations of improper purpose and of waiver or estoppel have been made, the necessary background facts are elaborate.

### A. *The Parties and Related Persons and Entities*

Defendant CRITEF Associates, formed in 1986, is a Delaware limited partnership based in Rockville, Maryland. Its sole purpose is to serve as the sole general partner of Capital Realty Investors Tax Exempt Fund Limited Partnership ("CRITEF"), also a Delaware limited partnership. The limited partners of CRITEF Associates are William B. Dockser, H. William Willoughby, Rockville Pike Associates–IV, and Mr. Schwartzberg. According to the partnership agreement, the general partners of CRITEF Associates are Schwartzberg, Dockser, Willoughby, and C.R.I., Inc. C.R.I. is a Delaware corporation now owned by Dockser and Willoughby.[1]

Defendant CRITEF III Associates, a Delaware limited partnership formed in 1987, is also based in Rockville, Maryland. Its sole purpose is to serve in the capacity of general partner to Capital Realty Investors Tax Exempt Fund III Limited Partnership ("CRITEF III") a Delaware limited partnership. The limited partners of CRITEF III Associates are Schwartzberg, Dockser, Willoughby, and Rockville Pike Associates–IV. C.R.I. is the sole general partner of CRITEF III Associates.

CRITEF and CRITEF III (as well as the Partnerships) were formed in 1986 and 1987, respectively, in response to changes in the tax laws. The Funds acted as mortgage lenders on eighteen multifamily housing properties; holding tax exempt bonds for which the properties serve as collateral. Although the Funds own the bonds they do not own the underlying properties because such ownership would destroy the tax exempt feature of the bonds. The underlying properties are owned by local "lower tier" partnerships. Although the eighteen properties originally were held in partnerships owned by developers, fifteen of the properties were taken back because they were not meeting their debt service and presently are held in partnerships affiliated with Dockser and Willoughby.

Investments in the Funds were originally sold to the public in the form of Beneficial Assignee Certificates ("BACS") and since 1993, the BACS have been publicly traded on the American Stock Exchange. BAC holders

---

1. Prior to 1990, Dockser, Willoughby, and Schwartzberg were equal shareholders of C.R.I., a corporation formed to develop, syndicate, and operate entities that invest in real estate pursuant to various tax incentive programs. C.R.I. has sponsored numerous public and private offerings of limited partnership interests in investment partnerships, including the Funds.

neither own nor have an interest in the underlying properties.

These entities and relationships are graphically represented in the following two diagrams:

## Defendant CRITEF Associates

Defendant CRITEF III Associates

### B. *The 1990 Buyout*

On January 1, 1990, Mr. Schwartzberg withdrew from the business of C.R.I. and sold his interest in C.R.I. to Mr. Dockser and Mr. Willoughby for approximately $4.5 million. Although Schwartzberg would no longer be active in C.R.I.'s business of managing investment partnerships (including CRITEF Associates, CRITEF III Associates, and consequently the Funds), the parties agreed that in order for him to avoid certain tax consequences Schwartzberg would remain designated as a general partner of CRITEF Associates. It was agreed however that he would have neither management power nor liability: As part of the buyout, an Indemnification Agreement was signed that was designed to protect Schwartzberg from liability for "any event that occurs on or after the effective date hereof that is related to the fact that [Schwartzberg] is or was a general partner of [CRITEF Associates]". In addition the parties entered an Agreement for Management Consulting Services pursuant to which Schwartzberg would be paid $100,000 a year for three years for consulting services provided to C.R.I. and the partnerships C.R.I. managed and an Asset Management Agreement pursuant to which Schwartzberg and a company wholly owned by him (CMS Inc.) would provide property level asset management services for part of C.R.I.'s government-assisted portfolio (which did not include any of the assets of the Funds) over a three-year term. He also remained a limited partner of both CRITEF Associates and CRITEF III Associates.

### C. *The Formation of CAPREIT and the Sale of CRICO*

In 1993, subsequent to Schwartzberg's withdrawal from the business, C.R.I. put together Capital Apartment Properties, Inc. ("CAPREIT") as an entity to own and man-

age multifamily properties. C.R.I. contributed contracts it had acquired to purchase about 25 properties and a management company, CRICO Management Company (including all of its personnel and assets),[2] to CAPREIT. A planned public offering of CAPREIT stock, however, was not accomplished and C.R.I. sought instead to make it a private REIT.

In February 1994, C.R.I. came to agreement with a third party, Apollo Advisors, according to which a new entity affiliated with Apollo—to be named AP CAPREIT—would put money into CAPREIT. Thereafter CAPREIT became a wholly owned subsidiary of AP CAPREIT. As part of the formation of CAPREIT, C.R.I. had retained an earn-out that would allow C.R.I., if certain hurdles were met, up to a 22 percent share of AP CAPREIT. In addition, the sale to Apollo was set up so that if no agreement could be reached as to the value of the management company (CRICO) by June 30, 1995, C.R.I. would have the right to take back CRICO.

By the end of June 1995 C.R.I. had reached an agreement with Apollo and AP CAPREIT about the sale of CRICO. Pursuant to that agreement (the "Redemption Agreement"), C.R.I. sold all of its interest in AP CAPREIT (including CRICO) to AP CAPREIT for $4.75 million; approximately $3.5 million was for CRICO and the remainder for C.R.I.'s carried interest in AP CAPREIT (the earn-out). The agreement also contained a provision for a termination refund. According to that provision, if there are terminations of the management contracts of CRICO, C.R.I. would have to pay back (to CAPREIT directly) some percentage of the original $3.5 million consideration received. The percentage of the refund is determined according to a formula that provides for de-

creasing amounts over a certain number of years.

### D. The CRITEF Merger

Shortly after the Redemption Agreement was reached between C.R.I. and Apollo Advisors, Apollo (through CAPREIT) inquired about acquiring the Funds. By September 1995 CAPREIT and C.R.I. had reached a preliminary agreement subject to the vote of the BAC holders, contemplating a merger in which the BACS would be canceled and the holders paid approximately $150 million. At that time the market capitalization for the Funds was approximately $120 to $125 million and the merger consideration therefore entailed about a 20% premium over the market price.

Pursuant to the proposed merger, CRITEF Associates' and CRITEF III Associates' general partner interests would be transferred to Apollo for consideration. The proceeds from the sale of these general partner interests would then flow to the partners of CRITEF Associates and CRITEF III Associates. Accordingly, Dockser, Willoughby, and Schwartzberg would each receive approximately $250,000.[3]

The merger agreement also provided that CAPREIT would pay C.R.I., approximately $4.5 million, on an outstanding account for accrued mortgage servicing and administration fees owed to C.R.I. Because the mortgage servicing and administration fees were subordinate to the debt service on the bonds, these fees had been accrued when properties became unable to generate interest payments in full. Thus, the accrued fees represented an asset (account receivable) for C.R.I. and a liability (an account payable) for the Funds. Payments on this amount could only occur when and if the interest on the particular property was brought current.[4] In addition,

---

2. CRICO had contracts to manage numerous properties, including the fifteen non-performing properties (of the original eighteen properties that served as collateral for the tax exempt bonds held by the CRITEF Funds) that were being held in the "lower tier" partnerships owned by Dockser and Willoughby.

3. Each of the general partner's would actually receive $500,000, but one half of Docker's, Willoughby's, and Schwartzberg's interests in CRITEF Associates and CRITEF III Associates had been assigned to the Resolution Trust Corpora-

tion in another connection so that each of them stood to receive $250,000 on their own behalf.

4. Because of a transaction C.R.I. consummated in June 1995 (the "CRIMII MAE transaction"), a portion of these accrued fees were owned by another unrelated public entity, CRIMII MAE, at the time of the proposed CRITEF merger. In June 1995 C.R.I. sold and merged its entire mortgage group into CRIMII MAE which in exchange assumed roughly $9 million worth of debt owed by C.R.I. and gave Dockser and Willoughby shares of CRIMII MAE. The plaintiff

upon consummation of the merger there would no longer be any termination refund payable (the potential give-back obligation would be canceled) under the Redemption Agreement. Of the maximum of $3.5 million that could have become refundable approximately $1.3 million is attributable to CRICO management contracts for CRITEF Fund properties and thus not refundable as a result of the merger.

Not long after the proposed merger was announced in September of 1995, class action litigation was initiated by certain BAC holders in this court. By February of 1996 a settlement of these suits was reached in principle and the merger terms were improved to provide BAC holders an aggregate amount of approximately $158.5 million (an increase of $8.5 million) and to reduce the amount paid to C.R.I. for the accrued fees from $4.5 million to $2 million.[5]

### E. *The Budget Dispute*

Although the business relationship between Dockser, Schwartzberg, and Willoughby appears to have been agreeable for the first three years or so after the buyout in 1990, it then began to deteriorate. In July 1995 a disagreement arose concerning Schwartzberg's budget for 1996 (*i.e.*, the budget for his company, CMS Inc.) under the Asset Management Agreement.[6] Mr. Schwartzberg desired that the amount he had received the year before—approximately $1.25 million—be provided under the contract but Mr. Dockser and Mr. Willoughby were unhappy with Schwartzberg's performance. They proposed a base contract with an incentive structure: $500,000 for asset management services, an incentive of up to $750,000 based on fees generated by sales and refinancings, and a 50–50 split of such fees after that. No agreement could be reached and Schwartzberg finally stated that

he would initiate litigation if his contract was reduced.

On September 6, 1995 Mr. Schwartzberg met with Mr. Dockser and Melissa Lackey, general counsel of C.R.I. They informed him of the proposed merger and its general terms, including the total amount to be paid to the BAC holders, the sale of the Partnerships' general partner interests, and the settlement of the accrued mortgage servicing fees. Mr. Schwartzberg inquired what his interest in the Partnerships was and whether he was entitled to a third ($1.5 million) of the accrued fees based on the fact that he had a right to one-third of C.R.I. revenues attributable to matters preceding his withdrawal from C.R.I. He was informed that his percentage interest in the Partnerships was 24 percent, but that since the accruals did not relate to the pre–1990 period, he was not entitled to share in the proceeds from the accrued fees. Schwartzberg also asked about the initial investment of the BAC holders and requested copies of the merger agreement and the proposed proxy statement. Mr. Dockser told him the initial investment was approximately $250 million and agreed to provide him with the merger information.

Shortly after this meeting plaintiff engaged counsel and on October 3, 1995 that counsel telecopied a letter to Dockser and Willoughby noting that plaintiff had potential claims arising from the Asset Management Agreement, the CRITEF merger, the CRI-MII MAE transaction, and certain other partnerships. The letter requested that Dockser and Willoughby provide documents in order that the potential claims might be investigated. Plaintiff's counsel thereafter met with counsel for Dockser and Willoughby but no resolution resulted and no documents were provided.

has now, in addition to the CRITEF merger, questioned this transaction and threatened to take legal action against it.

5. The agreement to settle the class actions is pending court approval.

6. Although the Consulting Agreement expired after its three-year term, the Asset Management

Agreement was extended twice and now has an expiration date of December 31, 1997. The original Asset Management Agreement provided for a fixed budget but was later amended so that the CMS's budget for the following year would be determined in good faith between the parties based on sales activity.

In November of 1995, still unable to resolve the budget issue, C.R.I. filed a declaratory judgment action in Maryland state court seeking to have the court decide the budget amount for 1996. The parties then met on December 8 and Schwartzberg presented a settlement proposal.[7] But once again the parties could not reach agreement.

## F. *Schwartzberg's Solicitation and Publicity Campaign*

Schwartzberg next filed a countersuit in Maryland in January 1996 alleging, among other things, breach of fiduciary duty on the part of Dockser and Willoughby in connection with the consideration they received or will receive in the CRITEF and CRIMII MAE transactions. The suit also alleged self-enrichment by Dockser and Willoughby in slashing the annual budget of CMS from $1.25 million to $500,000.

Around this same time, Schwartzberg initiated a campaign against C.R.I. Specifically he initiated a consent solicitation to replace C.R.I. as managing general partner of Capital Housing Partnerships, a series of over 125 real estate limited partnerships (not including the Partnerships or the Funds) of which Schwartzberg was one of the general partners.[8] On January 18, 1996, he issued a

press release announcing his consent solicitation with respect to the Capital Housing Partnerships; describing his lawsuit in Maryland, including its allegations that Dockser and Willoughby are self-dealing with respect to the CRITEF merger and the CRIMII MAE transaction and that Dockser and Willoughby stand to personally receive $9.3 million if the CRITEF merger is consummated[9]; and stating that two of these transactions were currently the subject of litigation by other C.R.I.-related investors.[10]

On February 1, 1996, Schwartzberg served letters on CRITEF Associates and CRITEF III Associates demanding inspection of lists of registered holders of BACS.[11] His stated purpose for this demand was "to permit [him] to communicate with the holders of the BACs *in connection with the replacement of CRITEF Associates as managing general partner of the Partnership* in accordance with the provisions of CRITEF's partnership agreement." PX1 (emphasis supplied). In a letter a few days later, Dockser and Willoughby rejected these demands. On February 6, 1996, plaintiff served additional demands on CRITEF Associates and CRITEF III Associates requesting to inspect numerous documents concerning the underlying properties securing the bonds.[12] The pur-

---

7. Although CMS (Schwartzberg's company) had previously provided both asset management services and disposition services under the Asset Management Agreement, Schwartzberg's proposed settlement provided that CMS would return the asset management function to C.R.I. and only perform the disposition services. Pursuant to his proposal C.R.I. and CMS would enter contracts with 10 year terms that would pay CMS $500,000 a year and Schwartzberg up to $150,000 annually.

8. At least five of these partnerships subsequently did designate Schwartzberg as managing general partner to replace C.R.I.

9. Mr. Schwartzberg testified that he arrived at the $9.3 million figure by adding the $4.75 million price of the Redemption Agreement (C.R.I.'s sale of its interest in AP CAPREIT, including CRICO, to AP CAPREIT) to the $4.55 million C.R.I. was to receive for the accrued mortgage servicing fees. Tr. T. 89. However, the proposed CRITEF merger agreement only provided for the cancellation of a portion of the potential give-back obligation under the Redemption Agreement (the termination refund that might be payable if certain management contracts are can-

celed); a refund that was capped at $3.5 million and of which only $1.3 million pertained to CRITEF Fund properties. In addition, the $4.55 million for accrued fees was reduced to $2 million on February 1 as a result of the agreement in principle reached in the class action litigation brought challenging the CRITEF merger.

10. Approximately two weeks prior to the press release, one of these suits had been dismissed with leave to amend.

11. Schwartzberg also sought inspection of the partnership agreements for CRITEF Associates and CRITEF III Associates. Those agreements were produced to Schwartzberg during discovery.

12. The requested documents included among other things: audited financial statements for the past couple of years; a list of capital improvements over $5,000 for 1993, 1994, and 1995 and projected for 1996; current traffic reports by week for the fourth quarter in 1995 and the comparable quarter for the prior year, including occupancy by unit type, move-ins, and move-outs; on a property by property basis, the name,

pose of this demand, according to plaintiff's letter, was "to evaluate the fairness of the [proposed CRITEF merger]." Dockser and Willoughby did not respond to these February 6 demands.

Also on February 6, C.R.I. informed plaintiff that they were terminating the Asset Management Agreement and plaintiff, in turn, issued another press release. In this press release, plaintiff announced that five of the Capital Housing Partnerships to date had designated him as managing general partner to replace C.R.I.; stated that the attempted termination of the Asset Management Agreement was a retaliatory measure by Dockser and Willoughby, who are self-dealing at the expense of the individual investors; and again repeated his allegation that Dockser and Willoughby stand to personally receive $9.3 million if the CRITEF merger is consummated.

On February 14, one day before he initiated this litigation, Schwartzberg issued an additional press release stating that the increased price being offered the BAC holders pursuant to the agreement reached in the class action litigation "appear[ed] inadequate and not in the best interests of CRITEF's public investors." This last press release also indicated that C.R.I. had refused to provide Schwartzberg with a list of the investors in the CRITEF partnerships, that Schwartzberg is opposing the transaction until C.R.I. provides him with financial statements for each of the eighteen properties, and that he was "urging other investors not to vote for the transaction until such time that the real values can be assessed." Finally, in this press release plaintiff again referred to the $9.3 million figure as self-dealing, specifically stating that "CRI, by its own admission, is attempting to 'cram down' this merger because its principals stand to benefit by an additional $4.55 million, on top of the $4.75

million they have already received from Apollo, if the CRITEF–CAPREIT transaction is consummated."

In response to these press releases and actions by the plaintiff, Dockser and Willoughby filed lawsuits in the Maryland state court and the United States District Court for the Southern District of New York seeking injunctions against plaintiff's solicitation efforts on the ground that he was making misleading statements with respect to the personal benefits Dockser and Willoughby would realize in connection with the merger, for using confidential information in violation of the Asset Management Agreement, and for soliciting BAC holders without complying with securities laws. Both courts have now issued injunctions against Schwartzberg.

## II. The Parties' Contentions

Mr. Schwartzberg proffers several independent avenues of analysis, each of which, in his view, lead to the conclusion that he has a right to the relief he seeks. He argues that 1) the partnership agreements of both CRITEF Associates and CRITEF III Associates grant him a right to the information sought; 2) based upon his status as a general partner of CRITEF Associates he has a right to the requested information pertaining to that partnership by virtue of Section 1519, or alternatively, Section 1520 of the Delaware Uniform Partnership Law; and 3) based upon his status as a limited partner of both CRITEF Associates and CRITEF III Associates, he has a right to the information sought under Section 17–305 of the Delaware Revised Uniform Limited Partnership Act.

 Defendants, in turn, attempt to erect numerous barriers to block plaintiff's avenues of access to the list of BAC holders and financial records of the properties.[13] First

address, and telephone number, of the local managing general partner as well as the accountant; and a copy of the fairness opinion and merger agreement.

13. As an initial matter, defendants even suggest that this court lacks subject matter jurisdiction to determine whether, with respect to CRITEF Associates, plaintiff is entitled to relief pursuant to 6 *Del.C.* §§ 1519–20. Their theory is that the Chancery Court does not have jurisdiction over a

partner's request to inspect partnership books because, absent statutory authority, inspection requests must be brought in the Superior Court pursuant to a mandamus proceeding. *See Shaw v. Agri–Mark, Inc.*, Del.Supr., 663 A.2d 464, 467– 68 (1995). Moreover, they say that, although this court clearly has jurisdiction over Count II (plaintiff's request for relief under § 17–305) by virtue of 6 *Del.C.* § 17–305(e), this court cannot exercise concurrent jurisdiction over a legal

they argue that plaintiff is only a "nominal" general partner of CRITEF Associates because he sold his substantial interests in 1990 and allegedly retained the general partner status as a formality, solely to avoid certain tax consequences. He is therefore estopped, they say, from relying on a general partner's right to information provided for in Sections 1519 or 1520.

The defendants also contend that the information requested is technically the records of the Funds (which are separate limited partnerships) rather than the Partnerships and plaintiff is not a partner of the Funds. Being the records of the Funds, defendants assert that the partnership agreements as well as the statutory provisions providing for access to the books of the Partnerships do not provide a basis for giving plaintiff the information.

Finally, they contend that plaintiff's motivation in seeking these records is, in part, to jeopardize the merger of the Funds—a merger that they (his previous business partners) put together—in order to extract concessions from them with respect to other pending litigation between them and himself and, in part, to seek to replace the Partnerships as manager of the Funds while such competition is not of course proscribed in general—new social benefits are thought to be occasioned by such competition—it is not a proper use of an investor's right to inspect books and records of an entity to use the information disclosed to competitively injure the entity. Such an improper purpose, defendants argue, precludes plaintiff from inspecting the records pursuant to the statutory information rights of a partner, general or limited.

Plaintiff's application for relief will be denied for the reasons set forth below.

### III. Decision

∎ I pass over the questions whether the records sought may be considered records of the Partnerships or whether Mr. Schwartzberg is estopped to claim rights as a general partner of CRITEF Associates. I find it unnecessary to address these questions because I conclude that the evidence establishes that the sole or predominant reason plaintiff seeks the list of BAC holders and financial records of the properties is 1) to attempt to replace the Partnerships as general partners of the Funds and, in the process 2) gain leverage against Dockser and Willoughby with respect to other litigation pending between them, all for his personal financial advantage and at considerable risk to the financial welfare of the Partnerships. These purposes meet a two part test for "improper purpose"; they are personal to the individual seeking access and they are adverse to the interests of the partnership considered jointly (that is, from the perspective of all partners). In my opinion, even assuming plaintiff's statutory rights to information as a partner (general or limited) would otherwise entitle him to access these records controlled by the Partnerships, the improper purpose that defendants have established confer on the Partnerships a defense to his claims.

---

claim (Count I) where this court's equity jurisdiction is based on such specific statutory authority.

In addition to the fact that such a conclusion in this case would defy any notion of judicial efficiency, defendants initially ignored 6 *Del.C.* § 17-111. Defendants were relegated to make the strained argument, in a post-trial letter to the court, that 6 *Del.C.* § 17-111 is strictly limited to enforcement of rights and obligations created by limited partnership agreements and does not reach statutory rights under the Delaware Revised Uniform Limited Partnership Act arising independent of such agreements. The plain language of the statute, however, vests this court with jurisdiction. It provides:

Any action to interpret, apply or enforce the provisions of a partnership agreement, or the duties, obligations or liabilities of a limited partnership to the partners of the limited partnership, or the duties, obligations or liabilities among partners or of partners to the limited partnership, or the rights or powers of, or restrictions on, the limited partnership or partners, may be brought in the Court of Chancery. Although plaintiff might look to 6 *Del.C.* §§ 1519-20 to determine his rights, it is only because 6 *Del.C.* § 17-403 incorporates those rights. Thus, a request for enforcement of any statutory rights pursuant to the Delaware Revised Uniform Limited Partnership Act by a general partner in a Delaware limited partnership against that partnership or her co-partners is properly brought in the Court of Chancery.

## IV. Discussion

### A. *The Sources of Rights Asserted:*

Plaintiff asserts two sources of rights: the partnership agreements and the statutes governing partnerships. Under the latter he asserts rights as a limited partner and with respect to CRITEF Associates, the rights of a general partner.

With respect to the relevant partnership agreements, the pertinent provision of each provides as follows:

### XX. BOOKS AND RECORDS

(a) The books and records of the Partnership shall be maintained in accordance with sound income tax accounting principles.

(b) The Partnership shall keep at its Office the following records, which are subject to inspection and copying at the reasonable request, and at the expense, of any Partner during ordinary business hours:

(i) current list of the full name and last known home or business address of each Partner, set forth in alphabetical order;

(ii) copy of this Agreement, together with executed copies of any powers of attorney pursuant to which this Agreement, and any amendments hereto, have been executed;

(iii) copies of the Partnership's federal, state and local income tax returns and reports, if any, for the three most recent years;

(iv) copies of (1) any effective written partnership agreements and (2) any fi-

nancial statements of the Partnership for the three most recent years; and

(v) the Partnership books.

With respect to statutory sources of inspection rights, the rights of a general partner are broad. Section 17–403 of title 6 of the Delaware Code provides that unless otherwise provided in the partnership agreement, a general partner of a Delaware limited partnership "has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners." The Partnership statute provides in Section 1519, that:

> The partnership books shall be kept, subject to any agreement between the partners, at the principal place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them.

■ It is to be noted that neither the partnership agreements nor Section 1519 contain an express limit concerning "purpose" and thus *in each instance one must begin with the recognition that a partner has no obligation to prove that it has a "proper purpose" in order to enforce one of these rights to the prescribed access.*[14]

### B. *Inferring An Improper Purpose Defense*

■ This recognition does not conclude the subject of purpose, however, since neither the partnership agreements nor Section 1519 expressly negate the notion that a defense of improper purpose is implied in the grants.[15] It is of course generally recognized

---

14. As for the rights of a limited partner in a Delaware limited partnership, section 17–305 of the Revised Delaware Uniform Limited Partnership Act makes clear that a limited partner's right to inspect books and records and to otherwise access information regarding the partnership is limited to "purpose[s] reasonably related to the limited partner's interest as a limited partner." The limited partner must make any demand in writing and set forth the purpose of such demand. 6 *Del.C.* § 17–305(d) (1991). Moreover, a general partner may deny a limited partner's demand for information if "the general partner in good faith believes [disclosure] is not in the best interest of the limited partnership." 6 *Del.C.* § 17–305(b) (1991). Thus, the limited partner must demonstrate a proper purpose in

requesting such information. Plaintiff has clearly not done so here.

15. In fact, treatises and cases in other jurisdictions have suggested that there may be an implicit proper purpose requirement in provisions equivalent to Section 1519. *See* J. William Callison, *Partnership Law and Practice* § 11.02, at 11–4 to 11–5 (1994) ("UPA § 19 does not require that a partner have a proper purpose to obtain access to partnership books, although such a requirement probably would be imposed by the courts in the appropriate case."); *Bromberg and Ribstein on Partnership* § 6.05 at 6:57 (1994) ("Perhaps a proper purpose limitation, like that in most corporate statutes, is implicit in the right of access."); *Sanderson v. Cooke*, 256 N.Y. 73,

that implicit obligations consistent with the text of written obligations may, indeed under correct conditions should be inferred under both statutes and contracts. *E.g. Skouras v. Admiralty Enterprises, Inc.,* Del.Ch., 386 A.2d 674 (1978) (purpose adverse to corporation negates stockholders statutory right to access to books) The conditions under which an implied contractual obligation may be inferred were narrowly construed by this court in *Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d 873 (1986); *see also E.I. DuPont De-Nemours and Co. v. Pressman,* Del.Supr., 679 A.2d 436, 443 Veasey, C.J. (1996) (citing *Katz* with approval on this point). It was there stated that an obligation may be inferred when, given the terms of the express contract made and the circumstances of the contracting process, it is more likely than not (actually in *Katz* the court said, "it is clear that" but that test is probably too high) that if the parties *had* thought to address the subject, they would have agreed to create the obligation that is under consideration by the court *ex post facto.* 508 A.2d at 880. While this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical. Let me turn to an application of it to these obligations.

Imagine individuals negotiating the terms of a partnership agreement with respect to access to information. Certainly all investors, whether limited partners or general partners will start with a bias in favor of access. Ongoing information will allow assessment of the investment and inform investment decisions—minimally buy, sell or hold decisions, but also perhaps voting or other choices open to the partner. Therefore cheap and ready access might be an expected default rule with respect to partners access to information. But there are costs of various kinds in allowing such access as well. So at some point it might be preferred by some to limit access or condition it. Arguably all relevant statutes, but certainly the limited partnership act allows this.[16]

In one set of circumstances, however, it seems rather clear that all rational investors (looking at the matter *ex ante* ) would elect to restrict access. That is when it is clearly established (by some reliable process) that the access will actually hurt the value of the joint investment. People will disagree perhaps when it is the case that access will harm or risk harm to the joint investment, but accepting both that the negotiators do trust some *ex post* process for determining it and assuming that they don't know *ex ante* whether or not they will be the investors with a private motivation (private gain) to seek such jointly hurtful access, there is little reason to suppose that they would not agree that access for an improper purpose should be restricted. Trust of the process is not a small matter, since the gatekeeper, if it is an interested party, may well have an incentive to restrict access in the name of protecting joint investment when in fact it seeks to protect only managerial control. Thus one cannot assume that rational negotiators would confer on managing partners discretion to determine what access would threaten harm to joint investment.

If I ask the question *Katz* suggests in the context presented here, that is had the par-

---

175 N.E. 518, 520 (N.Y.1931) (concluding that the right of inspection by an agent may be refused if that inspection is wanted for an improper purpose). Of course the rights of a general partner to access information are fundamental and generally interpreted as broad as feasible. Their rights to information can be thought analogous to a director's right to inspect books and records of the corporation to which he serves as a fiduciary. *See Holdgreiwe v. The Nostalgia Network, Inc.,* Del.Ch., C.A. No. 12914, 1993 WL 144604 Allen, C. (Apr. 29, 1993), Mem. Op. at 5 (noting the importance of a director's right to information). This does not mean, however, that there are no circumstances in which a court could find the denial of access justified. As in the corporate context, and although courts should be slow to do so, a court may deny the right to inspect books and records even though the statutory requirements have been satisfied. *See Skouras v. Admiralty Enter. Inc.,* Del.Ch., 386 A.2d 674, 678 (1978) ("[E]ven if a proper purpose for a demand is demonstrated and such demand is shown to be reasonably related to a plaintiff's interest as a stockholder, nonetheless such demand must not be for a purpose adverse to the best interests of the corporation.").

16. With respect to Delaware limited partnerships, Section 17–403 of title 6 of the Delaware Code provides that general partners have the rights of partners in general partnerships "[e]xcept as provided ... in the partnership agreement."

ties to the Partnership agreements thought to address the subject at the time of the formation of the entities, would they have agreed that access to Partnership information should be afforded to a partner in order to facilitate his attempt to replace the Partnership in its sole activity, only one answer is possible.[17]

In the absence of an explicit contractual provision or statutory language to the contrary, and in circumstances in which, as here, a partner denying another partner access to partnership business records can show that the partner seeking access is doing so for a purpose personal to that partner and adverse to the interests of the partnership considered jointly, the court is warranted in denying the request for access.

I note that I consider this matter entirely from the perspective of the Partnerships, because it is in the capacity of a partner in those entities that Mr. Schwartzberg sues. The rights of the BACS holders are not of concern to me at this juncture, although, as mentioned, there is a pending class action in this court in which the rights of those persons are the central concern.

In the circumstances presented, I find the defendants warranted in their refusal to disclose to plaintiff the information he requested. Plaintiff's request for relief is therefore denied.

---

17. The analysis would be no different, I conclude, though perhaps a bit less obvious, if one asks whether access should be provided to enable one partner to facilitate an attack upon a merger negotiated by the general partner of CRITEF III Associates and by the managing partners of CRITEF Associates. Since none of the original negotiators could know originally whether they would be dissenters or not it is I suppose unlikely that they would have agreed to a provision designed to facilitate costly disputes.