**CINCINNATI SMSA LIMITED PARTNERSHIP, a Delaware Limited Partnership, Plaintiff Below, Appellant,**

v.

**CINCINNATI BELL CELLULAR SYSTEMS COMPANY, an Ohio corporation, Defendant Below, Appellee.**

No. 429, 1997.

Supreme Court of Delaware.

Submitted: Feb. 10, 1998.
Decided: April 30, 1998.

Richard L. Sutton (argued), Thomas C. Grimm and Donna Lynn Culver, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Appellant.

Charles S. Crompton, Jr. and Robert K. Payson, of Potter Anderson & Corroon, Wilmington, Mark D. Wegener (argued), Edward Han and Kirstin A. Mueller, of Howrey & Simon, Washington, DC, for Appellee.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

VEASEY, Chief Justice:

We review the decision by the Court of Chancery to dismiss plaintiff's claim under Court of Chancery Rule 12(b)(6). At issue on appeal is whether the implied covenant of good faith and fair dealing provides a basis for implying terms in a limited partnership agreement. We affirm the decision of the Court of Chancery that, given the unambiguous terms set forth in the agreement, no additional obligations may be inferred under any set of facts that could be proven to support plaintiff's complaint.

### Facts

The memorandum opinion of the Court of Chancery sets forth the essential facts of this case.[1] After careful review, we have independently determined that the recitation of

---

1. *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.*, Del.Ch., C.A. No. 15388, 1997 WL 525873 (Aug. 13, 1997) (Mem. Op.).

those facts by the Court of Chancery is amply supported. We will recount here only a brief factual summary to frame our approach in affirming the judgment of the Court of Chancery.

Cincinnati SMSA Limited Partnership is a Delaware Limited Partnership ("the Limited Partnership") formed in 1982 for the purpose of providing "Cellular Service" to Cincinnati, Columbus and Dayton, Ohio. Cincinnati Bell Cellular Systems Company ("Cincinnati Bell") is a limited partner.

When it was formed, the Limited Partnership was one of a number of partnerships around the country comprised of AT&T affiliates and other regional telephone companies. In response to the advent of cellular telecommunication service, the Federal Communications Commission ("FCC") divided the United States into separate market regions for licensing purposes. Urban market regions are called Standard Metropolitan Statistical Areas ("SMSAs"). Within each SMSA, the FCC authorizes the grant of two cellular service licenses—one to a wireline telephone company (the "B side license") and the other to any entity other than a telephone company (the "A side license").

Through their cellular service affiliates, the wireline telephone companies for Cincinnati, Columbus and Dayton agreed to pursue the B side license for all three areas as one entity—the Limited Partnership. At the center of the parties' dispute in this case are three provisions contained in the Limited Partnership Agreement ("the Agreement").

Section 10.4 of the Agreement contains a noncompete provision, which reads as follows:

> [S]hould any Limited Partner or an Affiliate thereof desire to provide Cellular Service in areas within the [Limited Partnership's] SMSAs, but not through the Partnership, then such Limited Partner ... shall withdraw from the Partnership .... In no event shall any such Limited

Partner or its Affiliate thereof directly or indirectly own, operate, or engage in any business rendering Cellular Service in the [Limited Partnership's] SMSAs within five years after the withdrawal of such Limited Partner ... from the Partnership .... [2]

Under Section 2.4 of the Agreement, "Cellular Service" is defined as:

> Any and all service authorized by the FCC under Part 22 of its cellular rules as promulgated under the Cellular Radio Decisions and provided pursuant to the terms of this Agreement.

Aside from Cellular Service, the Agreement allows partners to pursue independent interests under the following provision in Section 7.4:

> *Ownership or Conduct of Other Businesses.* Subject to the provisions of [Section 10.4], the Partners may engage in or possess an interest in other business ventures of every kind and description. Neither the Partnership nor any Partner shall have any rights by virtue of this Agreement in such independent business ventures or to the income or profits therefrom.

In the 1990s, the FCC began licensing a new band of radio stations for a type of mobile telephone service called Personal Communications Services ("PCS").[3] PCS is regulated under Part 24 of the FCC regulations. In January 1997, Cincinnati Bell obtained a license to provide PCS and entered into an agreement to resell PCS offered by another provider.

### Procedural Background

The Limited Partnership brought this action against Cincinnati Bell for declaratory and injunctive relief, claiming that Cincinnati Bell's decision to offer PCS constituted direct competition with the Limited Partnership for which Section 10.4 of the Agreement required withdrawal.

---

**2.** Section 8.8 of the Agreement sets forth identical provisions with respect to the general partner.

**3.** Whereas the cellular radiotelephone service governed by Part 22 of the FCC's regulations and

designated in the Agreement uses radio bandwidths between both 825–845 MHz and 870–890 MHz, PCS uses the bandwidth between 1850–1990 MHz.

The Court of Chancery dismissed the action under Rule 12(b)(6) on the ground that PCS is not included within the definition of "Cellular Service" set forth in the Agreement. The Court further held that it would not imply a prohibition on competition through PCS. We affirm the decision of the Court of Chancery.

## Analysis

■■■ The briefing by both sides in this Court is commendable. Our review of this dismissal by the Court of Chancery under Rule 12(b)(6) is de novo.[4] We must determine whether it appears with reasonable certainty that plaintiffs would not be entitled to relief regardless of any set of facts that could be inferred from the pleadings.[5] We accept as true and limit our review to the well-pleaded allegations of the Limited Partnership's complaint, which include the terms of the Agreement.[6]

■■■ Delaware observes the well-established general principle that (absent grounds for reformation which are not present here) it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement.[7] In cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on "what the parties likely would have done if they had considered the issue involved."[8] In the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations.[9] But those cases should be rare and fact-intensive, turning on issues of compelling fairness.

The articulation of the standard for implying terms through application of the covenant of good faith and fair dealing represents an evolution from previous Delaware case law. In *Katz v. Oak Industries, Inc.*,[10] the Court of Chancery stated that the legal test for implying contractual obligations was whether it was *"clear* from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[11]

Delaware Supreme Court jurisprudence is developing along the general approach that implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise. In the 1992 case of *Merrill v. Crothall–American, Inc.*, this Court first recognized the limited application of the covenant to inducement representations in at-will employment contracts.[12] In that case, the Court was careful to heed the legal right of employers to pursue a certain amount of self-interest in the creation of contractual relationships.[13] The Court held that, to plead properly a claim for breach of an implied covenant of good faith and fair dealing in the inducement of employment, a plaintiff must

---

**4.** *Ramunno v. Cawley*, Del.Supr., 705 A.2d 1029, 1034 (1998); *Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 38 (1996). Furthermore, this Court treats the interpretation of contract language as a question of law also subject to de novo review. *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, Del.Supr., 672 A.2d 41, 43 (1996).

**5.** *Ramunno*, 705 A.2d at 1034; *In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 65 (1995).

**6.** *Ramunno*, 705 A.2d at 1034; *In re Santa Fe*, 669 A.2d at 65.

**7.** *Gertrude L.Q. v. Stephen P.Q.*, Del.Supr., 466 A.2d 1213, 1217 (1983).

**8.** *DuPont v. Pressman*, Del.Supr., 679 A.2d 436, 443 (1996); *Schwartzberg v. CRITEF Associates Ltd. Partnership*, Del.Ch. 685 A.2d 365, 375–76 (1996).

**9.** *Pressman*, 679 A.2d at 443.

**10.** Del.Ch., 508 A.2d 873 (1986).

**11.** *Id.* at 880 (emphasis added); *but see Schwartzberg*, 685 A.2d at 376 (*Katz* standard may be "too high"). We need not, however, address in the abstract these general observations by the Court of Chancery because these issues are inherently fact-intensive.

**12.** Del.Supr., 606 A.2d 96 (1992).

**13.** *Id.* at 101.

allege "an aspect of fraud, deceit or misrepresentation." [14]

Four years later in *DuPont v. Pressman,* this Court revisited the issue of good faith and fair dealing in at-will employment, this time in the context of a claim for wrongful termination. While citing *Katz* with approval, we stressed again the narrow scope of the covenant, holding that principles of good faith and fair dealing would hold culpable the acts of an employer directed toward creating fictitious grounds for termination. [15] Under the facts of that case, however, the application of the covenant extended no further, and the general doctrine of at-will employment was otherwise undisturbed. [16]

This Court should be no less cautious or exacting when asked to imply contractual obligations from the written text of a limited partnership agreement. [17] In this case, the plaintiff articulates a policy argument, which is cogent at first blush, in support of implying an additional noncompete obligation with respect to PCS. The Limited Partnership sets forth two circumstances underlying its case: (1) the development and licensing of PCS was unforseen at the time the parties entered into the Agreement; and (2) from a subscriber's perspective, PCS and "Cellular Service" are indistinguishable. [18] The Limited Partnership concludes that, based on principles of good faith and fair dealing, partners are also forbidden to compete with the Limited Partnership through independent inter-

ests in PCS, even though PCS does not fall within the strict definition of "Cellular Service" in the Agreement. Cogent as this argument might have been *ex ante* when the Agreement was negotiated, it is not a persuasive argument to vary the Agreement *ex post.*

■ The unambiguous terms of the Agreement ultimately defeat the plaintiff's case. [19] Section 2.4 defines "Cellular Service" in precise terms. Its meaning is confined to that service authorized by a discrete FCC regulation without room to include developing systems. [20] On the other hand, Section 7.4 provides unambiguously and expansively that, so long as "Cellular Service" is not involved, partners "may engage in or possess an interest in other business ventures of every kind and description." Taken together, these provisions explicitly limit prohibited competition and provide generous leeway to partners with respect to other ventures. We are not compelled to conclude that, had they thought to address the subject, the partners more likely than not would have agreed to include PCS—which operates on different radio bandwidths than "Cellular Service" and is separately regulated by the FCC—in the Agreement's noncompete clause.

Further, the Court of Chancery's decision does not violate rules of contract construction. The Court's reading of the Agreement does not render ineffective the provisions in

---

14. *Id.* at 101–02.

15. *Pressman,* 679 A.2d at 443–44.

16. *Id.* at 444.

17. *See Schwartzberg,* 685 A.2d at 375–76 (recognizing the narrow conditions under which obligations may be inferred from the text of a limited partnership agreement).

18. Like the mobile telephone service regulated by Part 22 of the FCC regulations, PCS operates through radio waves. When it first emerged as a competitor in the wireless service arena, however, PCS offered enhanced features such as paging, voice mail and caller ID that were not generally available with Cellular Service at the time.

19. The Court of Chancery concluded that "Cellular Service" was unambiguously defined in the

Agreement and declined to consider extrinsic evidence presented by plaintiff. Mem. Op. at 5–13. We note the correctness of the holding of the Court of Chancery on this issue despite that Court's reference to *Klair v. Reese,* Del.Supr., 531 A.2d 219 (1987). In *Eagle Ind. v. DeVilbiss Health Care,* Del.Supr., 702 A.2d 1228 (1997), released after the memorandum opinion of the Court of Chancery in this case, we held that *Klair* should be construed narrowly to conform to the principle that, where contract language is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity. *Id.* at 1232 n. 7.

20. *See Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Co.,* 3d Cir., 988 F.2d 386, 404 (1993), *cert. denied,* 510 U.S. 908, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993) ("It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments.").

the Agreement.[21] So long as partners are forbidden from competing with the Limited Partnership through "Cellular Service," declining to imply an additional obligation in the noncompete provision does not render the restrictions in Section 10.4 "commercially meaningless or illusory," as contended by the Limited Partnership. Similarly, the fact that the Court of Chancery's strict reading of an unambiguous agreement is undesirable to the Limited Partnership does not make that reading unreasonable or arbitrary.[22]

### Conclusion

After reviewing the unambiguous terms of the Agreement, we conclude that, regardless of any set of facts that may be inferred from the pleadings, no restriction on the partners' independent ability to offer PCS service may be implied. Accordingly, we affirm the decision of the Court of Chancery.

21. *See Sonitrol Holding Co. v. Marceau Investissements,* Del.Supr., 607 A.2d 1177, 1184 (1992) (holding that courts should construe contracts so as to give effect to all provisions).

22. *See Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818, 822 (1992).