# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCHULZ GROUP GMBH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2024-0943-LWW |
| | : | |
| JAMESTOWN PREMIER | : | |
| PROPERTY FUND, L.P. and | : | |
| JAMESTOWN PREMIER GP, L.P., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: March 26, 2025
Date Decided: June 17, 2025

Kurt M. Heyman & Emily A. Letcher, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; David Rivkin, FOX HORAN & CAMERINI LLP, New York, New York; *Counsel for Plaintiff Schulz Group GmbH*

Matthew E. Fischer, J. Matthew Belger, Jacqueline A. Rogers & Daniel M. Rusk, IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants Jamestown Premier Property Fund, L.P. and Jamestown Premier GP, L.P.*

**Will, Vice Chancellor**

An institutional investor committed $10 million to a real estate investment fund, acquiring partnership units in exchange. Over a year later, the fund's general partner called the capital—at a time when rising interest rates were depressing the commercial real estate market. The value of the investor's units suffered.

The investor sued in this court, claiming that the fund's general partner breached contractual duties by making the capital call amid adverse macroeconomic conditions. The investor acknowledges that the capital call likely benefited the fund. But it insists the general partner was obligated to serve the investor's best interest at the fund's expense.

Delaware law and the governing contracts undercut this line of reasoning. The general partner had full discretion to make capital calls. And it was obligated to promote the interests of the fund and all limited partners—not to prioritize one limited partner at the expense of the rest. As the investor's claims each stem from this misconception of the general partner's duties, the case is dismissed.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    Jamestown and Its Governance

Jamestown Premier Property Fund, L.P. (the "Fund") was launched in 2011. Its purpose is to acquire and manage investments in Real Estate Investment Trusts (REITs) for institutional investors.[2]  As of March 31, 2024, it had over $4 billion in gross assets and a net asset value of just under $1 billion.[3]

The Fund is organized as a Delaware limited partnership.[4]  Its affairs are governed by the Sixth Amended and Restated Limited Partnership Agreement of Jamestown Premier Property Fund, L.P. (the "Partnership Agreement"), which

---

[1] Verified Compl. (Dkt. 1) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citation omitted)); *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms.").

[2] Compl. ¶¶ 32, 38.

[3] *Id.* ¶ 34.

[4] *Id.* ¶ 28.

2

became effective on February 1, 2021.[5] Jamestown Premier GP, L.P. has served as the Fund's General Partner at all relevant times.[6]

The Partnership Agreement addresses the relationship between the General Partner and the Fund's limited partners.[7] It grants the General Partner significant discretion and authority over the management of the Fund.[8] The General Partner is empowered to determine—in its sole discretion—when to issue additional Fund units in exchange for new capital.[9]

### B. Schulz Group's Investment

On June 21, 2021, family office investor Schulz Group GmbH executed a Subscription Agreement in which it committed capital to the Fund.[10] The Subscription Agreement obligated Schulz to pay to the Fund up to $10 million (the "Subscribed Funds") in exchange for units priced by the Fund's "Net Asset Value,"

---

[5] *Id.* ¶ 41; Trans. Aff. of Daniel M. Rusk, IV in Supp. of Defs.' Opening Br. in Supp. of their Mot. to Dismiss the Verified Compl. (Dkt. 15) ("Defs.' Ex.") Ex. 1 ("Partnership Agreement").

[6] Compl. 1.

[7] *Id.* ¶ 41.

[8] *Id.* ¶ 39; *see, e.g.*, Partnership Agreement § 5.1(a)(iii) (stating that "the General Partner, in its sole discretion, shall have full, complete, and exclusive right, power, and authority in the management and control of the Partnership's business").

[9] *See* Partnership Agreement § 2.2 ("At any time, without the consent of any Limited Partner, subject to Section 5.4(f), the General Partner may cause the Partnership to issue additional [u]nits to the Partners . . . or to other Persons . . . .").

[10] Compl. ¶ 42; Defs.' Ex. 2 ("Subscription Agreement").

as defined in the Partnership Agreement.[11]  The General Partner has "sole discretion" to call the capital "at any time" before June 21, 2025 based on "the best interest of the [Fund]."[12]  Schulz retained the right to withdraw any of the Subscribed Funds not yet contributed by providing written notice to the General Partner.[13]

The Fund countersigned the Subscription Agreement on June 30, 2021, admitting Schulz as a limited partner.[14]

## C.    Economics of Commercial Real Estate Investing

Basic principles of commercial real estate investing provide helpful context for the events that follow.[15]

As a rule—all else equal—commercial property values fall when interest rates rise.[16]  That is partly because commercial properties are often purchased with

---

[11] *Id.*; Subscription Agreement § 1.  "Net Asset Value" is defined as "the [Fund's] net asset value," which is generally a measure of value calculated by subtracting a fund's liabilities from its assets.  *See* Partnership Agreement 15; *see also* James Chen, *Net Asset Value (NAV): Definition, Formula, Example and Uses*, Investopedia (last updated May 31, 2025), https://www.investopedia.com/terms/n/nav.asp.  It is calculated as of the last day of the most recent calendar quarter preceding the closing date, divided by the number of outstanding units on such date.  Subscription Agreement § 1.

[12] Compl. ¶ 49; Subscription Agreement §§ 1(a), (c); Partnership Agreement § 2.2(b).

[13] Compl. ¶ 50; Subscription Agreement § 1(a).

[14] Compl. ¶¶ 45-46.

[15] These principles are drawn from the Complaint or based on tenets of supply and demand.

[16] Compl. ¶ 62; *cf.* Chris Seabury, *How Interest Rates Affect U.S. Markets*, Investopedia (last updated Oct. 15, 2024), https://www.investopedia.com/articles/stocks/09/how-interest-rates-affect-markets.asp.

borrowed funds, and higher interest rates increase the cost of borrowing.[17]  For income-generating properties like office rentals, higher financing costs reduce returns.[18]

These downward pressures can lead to lower commercial property values.  In other words, there is generally an inverse correlation between interest rates and property values.  One would expect, then, that rising interest rates would cause the Fund's Net Asset Value to fall.[19]

In 2022, the effective federal funds rate soared.  It moved from 0.2% in the first quarter of 2022 to just over 4.0% at year end.[20]  Even so, the Fund's Net Asset Value for the first three quarters of 2022 remained effectively flat and at a peak.[21] Schulz believes that the General Partner knew this was bound to change.[22]

---

[17] Compl. ¶¶ 63, 75.

[18] *Id.* ¶ 76.

[19] *Id.* ¶ 79; *see also id.* ¶ 85 (depicting the relationship between the federal funds rate and the Fund's Net Asset Value from 2019 to 2023).

[20] *See Federal Funds Effective Rate*, FRED, https://fred.stlouisfed.org/series/FEDFUNDS (last updated May 1, 2025).  Schulz represents that the federal funds rate rose "from just above 0% in Q4 2021 to almost 1% in Q1 2022, to almost 2.5% in Q2 2022, to 3.5% in Q3 2022, and 4.5% in Q4 2022."  Compl. ¶ 84.  These rates are inconsistent with those documented publicly, of which I take judicial notice. *See Staley v. Peirson*, 1998 WL 1033076, at *3 (Del. Ch. Dec. 3, 1998) ("[J]udicial notice may be taken that interest rates did decline precipitously in the early 1990s and have not reached the high numbers of the 1980s.").

[21] Compl. ¶ 85.

[22] *See infra* note 61 and accompanying text.

5

## D. The Capital Call Notice

The Fund first observed the negative effects of rising interest rates on its portfolio in the fourth quarter of 2022.[23] It suffered a 12.09% net loss in the fourth quarter of 2022.[24] In the "Valuation Highlights" section of the Fund's 2022 Annual Report, the loss was ascribed to "economic uncertainty, inflation, rising interest rates, and market volatility."[25] The Fund explained that it was "placing a premium on liquidity as it [sought] to address upcoming loan maturities and taking a cautious approach to investing capital in 2023."[26]

On December 19, 2022, the Fund sent Schulz a capital call notice for the full $10 million of Subscribed Funds by January 3, 2023.[27] Around this time, the Fund's Net Asset Value took a slight downward turn from $3.11 billion to $2.76 billion.[28] Schulz expressed concern to the General Partner about the timing of the capital call.[29] Still, Schulz transferred $10 million to the Fund on December 23.[30] In

---

[23] Compl. ¶¶ 109-11.

[24] *Id.* ¶ 109.

[25] *Id.* (quoting 2022 Annual Report).

[26] *Id.*

[27] *Id.* ¶¶ 51-52.

[28] *Id.* ¶ 108

[29] *Id.* ¶ 135.

[30] *Id.* ¶ 56.

exchange, Schulz received 10,932.55353 units of the Fund at $914.6995 per unit, priced as of year-end 2022.[31]

In 2023, the Net Asset Value of the Fund's properties declined.[32] The Fund's per-unit price fell from $914 per unit at the time of the capital call to $443 per unit in the fourth quarter of 2023.[33] Within the year, the units Schulz received for its $10 million investment were valued at $4.843 million.[34]

### E. This Litigation

On September 10, 2024, Schulz filed a five-count Complaint against the Fund and General Partner for losses stemming from the December 2022 capital call.[35] In Counts I, II, and IV, it claims that the General Partner breached contractual duties set out in the Partnership Agreement.[36] In Count III, it claims that the General Partner breached the implied covenant of good faith and fair dealing.[37] And in Count V, it claims that the Fund was unjustly enriched by the Subscribed Funds.[38]

---

[31] *Id.* ¶ 57.

[32] *Id.* ¶¶ 90-91.

[33] *Id.* ¶ 59.

[34] *Id.* ¶ 61.

[35] Dkt. 1.

[36] Compl. ¶¶ 119-32, 139-43.

[37] *Id.* ¶¶ 133-38; *see* Tr. of Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 24) ("Hr'g Tr.") 20-21.

[38] Compl. ¶¶ 144-48.

7

The defendants moved to dismiss the Complaint on October 7, 2024.[39] Briefing was completed on January 31, 2025.[40] I heard oral argument on March 26 and took the motion under advisement.[41]

## II.   ANALYSIS

The defendants seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[42]

"The standards governing a motion to dismiss for failure to state a claim are well settled."[43] The motion is governed by the reasonable conceivability standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[44]

---

[39] Dkt. 10; *see* Defs.' Opening Br. in Supp. of Mot. to Dismiss (Dkt. 15) ("Defs.' Opening Br.").

[40] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 18) ("Pl.'s Answering Br."); Defs.' Reply Br. in Further Supp. of Mot. to Dismiss (Dkt. 20) ("Defs.' Reply Br.")

[41] Dkt. 23; *see* Hr'g Tr.

[42] Defs.' Opening Br. 23.

[43] *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

[44] *Id.* (citation omitted).

"[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claims as a matter of law."[45]

As explained below, the Complaint is deficient even under this plaintiff-friendly standard. Schultz fails to state a viable claim for breach of an express or implied contract term, and its unjust enrichment claim is foreclosed by the parties' contracts. Dismissal of each claim results.

A.    Breach of Express Contractual Duties

In Counts I, II, and IV, Schulz alleges that the General Partner breached contractual duties of good faith, loyalty and care set out in Section 11.1 in the Partnership Agreement.[46] Its overarching theory is that Section 11.1 obligated the General Partner to consider and act in Schulz's best interest. Under Section 11.1 of the Partnership Agreement, the General Partner has:

> (a) a duty to act in good faith and in a manner it reasonably believes to be in the best interest of the [Fund] and the Limited Partners; (b) the fiduciary duty of loyalty and the implied contractual covenant of good faith and fair dealing to the [Fund] and the Limited Partners, as arising under the [LP] Act; and (c) a duty to act with the care that an ordinarily prudent institutional real estate advisor in a like position would exercise under similar circumstances[.][47]

---

[45] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[46] Schulz clarified that it is advancing claims for breach of the Partnership Agreement—not for breach of fiduciary duty. *See* Pl.'s Answering Br. 19; *see also* Compl. ¶¶ 119-24, 125-32, 139-43.

[47] Partnership Agreement § 11.1.

Schulz asserts that the General Partner breached these duties by calling Schulz's funds at a time disadvantageous to Schultz.

These claims fail for two independent reasons. First, the capital call was made in line with the Partnership Agreement. Second, the General Partner owed duties to the Fund and limited partners as a whole—not to Schulz individually.

### 1. The Partnership Agreement's Terms

The partners in a Delaware limited partnership have great flexibility in structuring the entity's governance.[48] Through a partnership agreement, they may modify the traditional fiduciaries owed "by a partner or other person," including by "restrict[ing] or eliminat[ing]" those duties.[49] Partnership agreements can effectively "act as safe harbors for actions that might otherwise qualify as breaches of fiduciary duties under the traditional default rules."[50]

---

[48] *See Kahn v. Icahn*, 1998 WL 832629, at *2 (Del. Ch. Nov. 12, 1998) ("Delaware law permits partners to agree on their rights and obligations to each other and to the partnership."), *aff'd*, 746 A.2d 276 (Del. 2000).

[49] 6 *Del. C.* § 17-1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

[50] *Icahn*, 1998 WL 832629, at *2 (citation omitted); *see also In re Cencom Cable Income P'rs, L.P. Litig.*, 1996 WL 74726, at *4 (Del. Ch. Feb. 15, 1996) ("[W]hether a general partner acts in good faith, with due care or with requisite loyalty may be determined by the consistency with which the general partner adheres to its contractual obligations. Put another way, the limited partnership agreement may authorize actions creating a 'safe harbor' for the general partner under circumstances that might otherwise be questionable

Consistent with these principles, the Partnership Agreement states that "the General Partner's duties contemplated by [] Section 11.1 shall not be violated by any act performed or omission to perform by the General Partner . . . in good faith and in accordance with the express provisions of th[e] [Partnership] Agreement."[51] To state a claim for breach of the general duties described in Section 11.1, Schulz must plead facts showing that the General Partner's actions were (1) not expressly permitted by the Partnership Agreement's terms or (2) taken in bad faith. It has done neither.

First, Section 2.2(a) of the Partnership Agreement empowers the General Partner to, in its "sole discretion," issue partnership units in connection with a capital call "[a]t any time, without the consent of any [l]imited [p]artner."[52] Schulz does

---

or impose a stricter standard of scrutiny than the norm."); *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, 1996 WL 752364, at *14 (Del. Ch. Dec. 23, 1996) ("Where . . . a [p]artnership [a]greement specifically addresses the rights and duties of the partners, any fiduciary duty that might be owed by the [l]imited [p]artners is satisfied by compliance with the applicable provisions of the partnership agreement."); Martin I. Lubaroff et al., *Lubaroff & Altman on Delaware Limited Partnerships* § 14.08 (2d ed. Supp. 2022) ("[U]nless otherwise provided in a partnership agreement, a partner . . . shall not be liable . . . for breach of fiduciary duty for the partner's . . . good faith reliance on the provisions of the partnership agreement.").

[51] Partnership Agreement § 11.1.

[52] *Id.* § 2.2(a) ("At any time, without the consent of any Limited Partner, subject to Section 5.4(f), the General Partner may cause the Partnership to issue additional units to the Partners . . . or to other Persons and admit such other Persons as Limited Partners and reflect such issuance in the books and records of the Partnership in exchange for such Capital Contribution as is determined by the General Partner to be appropriate in its sole discretion, at one or more subsequent closings . . . ."). The Subscription Agreement further provides the General Partner with the authority to make capital calls "at any time" and "in

11

not seem to dispute that the capital call was made under Section 2.2(a). Nor does it contend that the General Partner breached Section 2.2(a) in making the capital call. Its lone claim is that the capital call violated the standards of care outlined in Section 11.1 of the Partnership Agreement.[53]

Schulz cannot rely on the general duties in Section 11.1 of the Partnership Agreement to modify or override the specific right contemplated by Section 2.2(a).[54] "[W]here parties have [an] elaborated statement of their respective rights and duties," those express "rights and duties . . . , and not the vague language of a default

---

amounts to be determined . . . in its sole and absolute discretion." *See* Subscription Agreement §§ 1, 2.

The parties debate whether the Subscription Agreement is incorporated into the Partnership Agreement, such that the Subscription Agreement is included within the safe harbor in Section 11.1 of the Partnership Agreement. *See* Partnership Agreement § 11.1 (providing exculpation for acts taken in good faith and authorized by "*this Agreement*" (emphasis added)); Defs.' Opening Br. 39-40; Pl.'s Answering Br. 40; *see also* Hr'g Tr. 22-23. Because the General Partner's conduct is also authorized by the Partnership Agreement, I need not resolve this dispute.

[53] *See* Compl. ¶ 118; *see also* Pl.'s Answering Br. 8.

[54] *See Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 253-54 (Del. 2017) (explaining that a general contractual standard of care only "operates in the spaces of the [agreement] without express standards" such that the affirmative obligations imposed by specific contractual requirements controlled); *see also Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *13-14 (Del. Ch. July 6, 2018) (reasoning that a "contractual good faith standard . . . only 'operates in the spaces of the LPA without express standards'" and concluding that a contractual standard of good faith did not "displace or otherwise 'modify' [the general partner's]" express contractual obligations in other parts of the agreement).

fiduciary duty, will form the metric for determining breach of duty."[55] The specific/general canon of contract construction bolsters this conclusion.[56]

Further, nothing in the Complaint supports a reasonable inference that the General Partner made the capital call in bad faith. The Partnership Agreement's description of "good faith" mirrors that expressed under traditional Delaware law fiduciary duties.[57] Schulz does not allege that the General Partner intentionally disregarded its duties, effectively committed waste, or acted with a purpose other than advancing the Fund's and limited partners' interests.[58] In fact, Schulz acknowledges that the capital call may have been beneficial to the Fund.[59]

---

[55] *Cantor Fitzgerald. L.P. v. Cantor*, 2001 WL 1456494, at *5 (Del. Ch. Nov. 5, 2001) (quoting *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, 1996 WL 342040, at *5 (Del. Ch. June 12, 1996)).

[56] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[57] *See* Partnership Agreement § 11.1 (discussing the General Partner's obligation to act "in good faith and in a manner it reasonably believes to be in the best interest of the Partnership and the Limited Partners"); *cf. In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (stating that a lack of good faith can be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" (citation omitted)).

[58] *See IBEW Local Union 481 Defined Contribution Plan Tr. v. Winborne*, 301 A.3d 596, 621-23 (Del. Ch. 2023) (discussing bad faith in the corporate context); *see also McElrath v. Kalanick*, 2019 WL 1430210, at *10 (Del. Ch. Apr. 1, 2019) (same), *aff'd*, 224 A.3d 982 (Del. 2020).

[59] Compl. ¶ 130; *see infra* note 63 and accompanying text.

Schulz's theory of bad faith rests on a belief that the General Partner should have made the capital call at a time advantageous to Schulz. This argument misinterprets to whom the General Partner's duties under Section 11.1 are owed. I turn to that issue next.

### 2. The General Partner's Fiduciary Duties

Schulz asserts that the General Partner breached the standards of care outlined in Section 11.1 of the Partnership Agreement by calling Schulz's Subscribed Funds in late December 2022 at a per unit price based on the Fund's year-end 2022 Net Asset Value.[60] The General Partner allegedly knew that since the Fund's 2022 Net Asset Value was unaffected by "historic interest rate hikes in 2022," the Net Asset Value was "bound to fall dramatically throughout 2023."[61] Thus, the timing of the capital call was disadvantageous to Schulz because a drop in Net Asset Value would diminish the value of its units.[62]

Schulz concedes that the capital call "may have been in the best interest of the [Fund]."[63] Yet it insists that the General Partner should have timed the capital call based on Schulz's distinct needs because only Schulz—and none of the Fund's other

---

[60] Compl. ¶¶ 9-10.

[61] *Id.* ¶ 11; *see id.* ¶ 12.

[62] *See id.* ¶¶ 24-25; *supra* notes 11, 19 and accompanying text.

[63] Compl. ¶ 130.

limited partners—lacked equity in the Fund at the time of the capital call.[64] But the Partnership Agreement does not distinguish between duties held toward limited partners with and without equity interests.[65]

The General Partner would be thrust into a catch-22 if the distinct duties Schulz envisions were imposed.[66] As Schulz sees it, the General Partner breached its duties to Schulz by making the capital call to support the Fund and preserve the investments of other limited partners, while harming Schulz's unique interests. Correspondingly, though, the General Partner could breach its duties to the Fund and other limited partners if it forewent or delayed the capital call to benefit Schulz.

Both Delaware law and the Partnership Agreement's terms belie Schulz's stance. "[A] general partner owes fiduciary duties to the partnership and the limited partners"—not a duty to prefer the interests of one partner at the expense of all other

---

[64] *Id.* ¶¶ 21-22; *see* Pl.'s Answering Br. 26-27. Schulz first received Fund equity after the capital call. Compl. ¶ 21 ("At the time of the [c]apital [c]all by the General Partner, Schulz [] held no equity or other economic interest in the Fund, despite having become a limited partner in the Fund in June 2021 upon acceptance by the General Partner of the Subscription Agreement.").

[65] *See* Partnership Agreement 12 (defining "Limited Partners" as "all Partners except the General Partner"); *id.* § 11.1 (referring to all "Limited Partners"); *see also id.* at 17 (defining "Partner" to include "a Person who has executed the Subscription Agreement that the Partnership has accepted").

[66] *See* Hr'g Tr. 28-29. Imposing this distinction would also render illusory Schulz's "irrevocable" commitment by making it effectively revocable if Schulz disagrees with an investment decision. *See* Subscription Agreement § 1(a).

partners or the partnership.[67] Section 11.1 of the Partnership Agreement confirms that the General Partner's duties flow to "the [Fund] and the Limited Partners" as a whole.[68] The General Partner does not—as Schulz believes—have a duty to act "in the best interest of [Schulz]" alone.[69]

To salvage its claims, Schulz cites a statement from the Court of Chancery's decision in *Gilbert v. El Paso*: "[I]t cannot be concluded . . . that the directors can never owe a duty to a particular shareholder subclass or group."[70] That case undercuts Schulz's argument. In *Gilbert*, the court emphasized—in the corporate context—that any class-specific duty is exceedingly limited.[71] It explained that fiduciaries should generally "act to serve an overriding or paramount interest of the

---

[67] *JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 784 (Del. 2022).

[68] Partnership Agreement § 11.1.

[69] Compl. ¶ 123; *see also id.* ¶ 126 (alleging that the General Partner "has a contractual duty to Schulz [] as set out in paragraph 11.1 of the Partnership Agreement"); ¶ 129 ("[T]he General Partner breached its duty of loyalty to [] Schulz . . . .").

[70] Pl.'s Answering Br. 25 (quoting 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990)).

[71] *Gilbert*, 1988 WL 124325, at *9; *see id.* at *10 ("Our case law recognizes that the directors may take whatever action that, in their proper exercise of business judgment, will best serve the interests of the corporation or the entire body of shareholders. That such action may adversely affect the interests of a particular shareholder subgroup, will, in certain instances, be unavoidable."); *see also McRitchie v. Zuckerberg*, 315 A.3d 518, 557 (Del. Ch. 2024) ("[D]irectors do not become fiduciaries for the stockholders as individuals."); *cf. Dohmen v. Goodman*, 234 A.3d 1161, 1167 (Del. 2020) ("As a fiduciary, and absent contractual modification, a general partner's duties to limited partners and the partnership parallel those exercised by directors of Delaware corporations.").

16

corporation or its shareholders as a group, even if, as an incidental result, the interests of a subgroup, such as the class, were adversely affected."[72]

The Complaint outlines the softening market and capital needs of the Fund leading up to the capital call.[73] It cannot reasonably be inferred from these facts that the General Partner's actions were contrary to interests of the Fund or its limited partners. And no duty exists towards Schulz individually. The claims for breach of contract (Counts I, II, IV) are therefore dismissed.

## B. Breach of the Implied Covenant

The implied covenant—though rarely successfully invoked—"attaches to every contract."[74] The Partnership Agreement is no exception.[75] Schulz asserts that the General Partner breached the implied covenant of good faith and fair dealing by making the capital call "despite knowing that the value of the [u]nits of the Fund that

---

[72] *Gilbert*, 1988 WL 124325, at *10.

[73] *See* Compl. ¶¶ 104-07.

[74] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005); *see id.* (recognizing that the implied covenant is applied with "occasional necessity" (citing *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998))); *see also Cincinnati Bell*, 708 A.2d at 992 (stating that the implied covenant should be applied in "rare and fact-intensive [cases], turning on issues of compelling fairness").

[75] Partnership Agreement § 11.1(b) (confirming that the General Partner had to act consistent with the "implied contractual covenant of good faith and fair dealing . . . , as arising under the [LP] Act"); *see* Pl.'s Answering Br. 44; Compl. ¶ 137.

would be purchased by Schulz [] with the [Subscribed] Funds (based on a December 31, 2022 Net Asset Value) would drop significantly in 2023."[76]

Schulz correctly identifies that the implied covenant can serve a gap-filling function where a contract grants discretion to one party.[77] But "if the scope of discretion is specified, there is no gap in the contract as to the scope of the discretion, and there is no reason for the Court to look to the implied covenant to determine how discretion should be exercised."[78] Here, the Subscription Agreement and Partnership Agreement define the scope by which the General Partner may exercise its discretion to issue capital calls. These contracts define the formula for the purchase price, the time when Schulz must invest its committed capital if called, and the general priority by which the General Partner can draw down committed capital, while conferring broad discretion on the General Partner to determine when to issue a capital call, how much capital to call, and which limited partner's committed capital to call.[79]

---

[76] Compl. ¶ 136.

[77] Pl.'s Answering Br. 45-46; *see Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) ("The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party.").

[78] *Miller v. HCP & Co*., 2018 WL 656378, *9 (Del. Ch. Feb. 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018).

[79] *See* Subscription Agreement §§ 1(b) (defining general priority for drawdowns), 2(a)-(b) (conferring the discretion to determine closing date and amount for a capital call); *see also* Partnership Agreement §§ 2.2, 5.1(a), 14.12.

Schulz cannot dispute that the General Partner had "full discretion" to execute the capital call.[80] Under the Subscription Agreement, the General Partner had "the right to draw down the Subscribed Funds *at any time* prior to the date which is forty-eight (48) months from the [s]ubmission [d]ate."[81] Schulz nevertheless maintains that the General Partner breached its contractual duty "by exercising its discretion . . . knowing that the [Net Asset Value] of the Fund was about to drop significantly."[82]

The Delaware Supreme Court's decision in *Nemec v. Shrader* illustrates the weaknesses in Schulz's argument.[83] There, the plaintiffs claimed that directors breached the implied covenant by exercising an "absolute contractual right to redeem" the plaintiffs' shares "at any time" and "at book value."[84] The defendants allegedly knew the plaintiffs would receive more in an anticipated deal if their shares were unredeemed, but redeemed the shares anyway to benefit other stockholders.[85] In affirming the dismissal of the implied covenant claim, the court explained that

---

[80] Pl.'s Answering Br. 45.

[81] Subscription Agreement § 1(a) (emphasis added); *see also id.* § 1(b)(ii)(8) (stating that drawdowns may be made in "instances as are determined by the General Partner in its sole discretion to be in the best interest of the Partnership based on capital needs of the Partnership and the timing of such capital needs").

[82] Pl.'s Answering Br. 46.

[83] 991 A.2d 1120 (Del. 2010).

[84] *Id.* at 1123, 1127.

[85] *Id.* at 1124.

"[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[86]  It observed that "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[87]

Even if room remained for the implied covenant, Schulz's claim would fail. Schulz must show that the General Partner exercised its discretion "arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[88]  The Complaint lacks factual allegations that could reasonably satisfy that standard.[89]

Schulz made an irrevocable investment of capital.  In doing so, it confirmed that it could "afford to suffer the complete loss of [its] [u]nits and [c]apital [c]ontribution."[90]  Now that it has suffered losses, it seeks to secure greater protections than it bargained for.  The implied covenant will not, however, shield

---

[86] *Id.* at 1128.

[87] *Id.* at 1127.

[88] *Id.* at 1126.

[89] *See supra* note 63 and accompanying text (discussing that the capital call was, according to the Complaint, favorable to the Fund).

[90] Subscription Agreement § 5(e).

parties from the explicitly anticipated risks of their own contracting.[91]  Count III is dismissed.

### C. Unjust Enrichment

Schulz's final claim is for unjust enrichment (Count V), which is brought against the Fund.  Schulz asserts that its payment of the Subscribed Funds "constitutes an enrichment by the Fund at the expense [of Schulz], under circumstances that cannot be reasonably justified."[92]  As a remedy, Schulz seeks the return of its Subscribed Funds in exchange for the units it received.[93]

This claim is legally baseless.  "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[94]  Unjust enrichment is not a tool to "rewrite a comprehensive contract governing the entirety of the parties' relevant relationship after finding disappointment in the resulting agreement."[95]  Thus, when an

---

[91] *See Nemec*, 991 A.2d at 1126 ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider— particularly where the contract authorizes the Company to act exactly as it did here.").

[92] Compl. ¶ 145; *see* Pl.'s Answering Br. 46-48.

[93] Compl. ¶ 148.

[94] *Kuroda v. SPJS Hldgs, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[95] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009).

enforceable contract controls the parties' relationship, "a claim for unjust enrichment will be dismissed."[96]

The Fund is party to both the Partnership Agreement and the Subscription Agreement, which govern the parties' rights and obligations related to the capital call.[97]  Schulz concedes this—as it must.[98]  Its only rebuttal is that the unjust enrichment claim can stand because the provisions of the Partnership Agreement purportedly breached were "obligations of the General Partner"—not obligations of the Fund.[99]  But the fact remains that contracts are the measure of Schulz's rights.[100]

Because enforceable agreements control, Count V is dismissed.

## III.  CONCLUSION

For the reasons explained above, Counts I through V of the Complaint are deficient.  The Complaint fails to state any claim on which relief can be granted.  This case is dismissed with prejudice under Rule 12(b)(6).

---

[96] *Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at * 18 (Del. Ch. Oct. 10, 2006).

[97] *See generally* Partnership Agreement 1; Subscription Agreement 1; *see also supra* note 79 and accompanying text.

[98] Pl.'s Answering Br. 47; *see also* Hr'g Tr. 36.

[99] Pl.'s Answering Br. 47; *see also* Hr'g Tr. 36.

[100] *See Kuroda*, 971 A.2d at 891-92.