# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ALEXANDER MONICA, JUDY KOCH, JOANNE GARTON, SANDRA PERKOWITZ, AL GESITE, and BRUCE BROWN,

        Plaintiffs,

        v.

DELTA DATA SOFTWARE, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N25C-05-185 PAW CCLD

Date Submitted: November 7, 2025
Date Decided: February 10, 2026

## <u>MEMORANDUM OPINION</u>

*Upon Defendant's Motion to Dismiss;*
**GRANTED, in part and DENIED, in part.**

Gary W. Lipkin, Esq.; Allison M. Neff, Esq.; Devan A. McCarrie, Esq.; and Jazmine B. King, Esq., of Saul Ewing LLP; Jared C. Miller, Esq.; and R. David Gallo, Esq., of Parker Hudson Rainer & Dobbs LLP, *Attorneys for Plaintiffs Alexander Monica, Judy Koch, Joanne Garton, Sandra Perkowitz, Al Gesite, and Bruce Brown*.

Rebecca L. Butcher, Esq.; Jennifer L. Cree, Esq.; and Cheol W. Park, Esq., of Landis Rath & Cobb LLP; Michael J. McMahon, Esq.; Kimberley Scimeca, Esq.; and Bethany M. Robinson, Esq., of Cooley LLP, *Attorneys for Defendant Delta Data Software, Inc.*

**WINSTON, J.**

## I.  INTRODUCTION

This is an earnout dispute in connection with Plaintiffs' sale of their business to Defendant.  As part of the deal, Defendant agreed to make an earnout payment if certain post-closing revenue metrics were met.  One condition for including a contract in those revenue metrics was that the customer needed to make a payment by March 31, 2025.  Plaintiffs agree that the revenue metrics were not met under the express terms of the sale agreement.  In most cases, that would be the end of the matter.  In moving to dismiss, Defendant contends it should be here too.

But here, the complaint pleads facts that Defendant took affirmative acts to avoid collecting a customer's payment and did so for the purpose of avoiding the earnout.  In the absence of an express term governing Defendant's conduct related to collection of payment, the complaint pleads that Defendant's actions breached the implied covenant.  The complaint also pleads a claim for breach of contract because Defendant caused the failure of a condition to the earnout payment.

Plaintiffs bring a fraud claim as well.  They contend that Defendant promised that it would count a contract toward the earnout payment's revenue metrics even if there had not been payment on it by March 31, 2025, and that Plaintiffs relied on that promise to their detriment.  Delaware law imposes a high standard to plead fraud based on promises of future performance.  That standard requires plaintiffs to plead

2

specific facts regarding the promisor's state of mind at the time of the promise. Because the complaint does not plead such facts, Plaintiff's fraud claim is dismissed.

Plaintiffs also bring two remedy-related claims. One, for contractual indemnification of litigation expenses, survives with the contract-based claims. The other, for punitive damages, is dismissed with the fraud claim.

In addition to arguing that the complaint fails to state a claim, Defendant contends that the sale agreement requires this case to be submitted to an accounting firm rather than this Court. But the agreement's accounting firm procedures do not fit this dispute, which requires legal determinations outside of an accounting firm's expertise. Accordingly, Defendant's motion to dismiss on this basis is denied, and the remaining claims may proceed in this Court.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. PLAINTIFFS SELL THEIR BUSINESS TO DEFENDANT

Plaintiffs formerly owned Phoenix Systems, Inc. ("Phoenix").[2] Defendant Delta Data Software, Inc. ("Delta Data" or "Defendant") purchased Phoenix from

---

[1] The facts are drawn from the complaint (D.I. 1) and the documents incorporated therein. The Court accepts as true the complaint's well-pled facts solely for purposes of Defendant's motion to dismiss. Plaintiffs attached two documents to their answering brief that were not attached to the complaint. *See* D.I. 11, Exs. 1-2. The Court need not determine whether it is appropriate to consider those two documents because neither of them would affect the outcome.

[2] Compl. ¶ 10.

3

Plaintiffs pursuant to a Stock Purchase and Contribution Agreement, dated March 7, 2024 (the "SPCA").[3]  Of the six Plaintiffs, Alexander Monica serves as "Sellers' Representative."[4]

As consideration for certain of their interests in Phoenix, Plaintiffs received an equity interest in Defendant's parent company.[5]  In addition, the SPCA provided that Plaintiffs could receive an earnout payment (the "Earnout Payment").[6]

## B.    THE SPCA'S TERMS

The SPCA provides the terms under which Plaintiffs could receive the Earnout Payment.  Section 2.4(a) provides, in part:

> [Defendant] will pay to [Plaintiffs] (i) an earnout payment of $2,328,806.25 if 2024 ARR is at least $[redacted]; and (ii) if 2024 ARR exceeds $[redacted], an additional earnout payment of up to $2,328,806.25 determined by multiplying every dollar of 2024 ARR over $[redacted] by 2.73 (capped at a maximum of $[redacted] 2024 ARR) (the "Earnout Payment") . . . .[7]

"2024 ARR" is defined to mean:

> an amount equal to an amount equal to [*sic*] twelve (12) times the Monthly Recurring Revenue as of December 31, 2024, for any contract that meets the following criteria: (i) entered into on or before December 31, 2024, (ii) is in full

---

[3] *Id.* ¶¶ 11-12.

[4] *Id.* ¶ 28; Compl. Ex. A (hereinafter "SPCA") at 3.

[5] Compl. ¶ 12.

[6] *Id.* ¶ 13.

[7] SPCA § 2.4(a).

4

force and effect as of March 31, 2025 because such contract has not been terminated or expired as of March 31, 2025 and [Phoenix] has not received written notice of termination or non-renewal as of March 31, 2025, (iii) contains a minimum one-year term, and (iv) an initial payment under such contract has been made on or prior to March 31, 2025.[8]

The SPCA provides that any Earnout Payment shall be made by April 1, 2025.[9] It also reiterates that no Earnout Payment will be made if a certain amount of 2024 ARR is not met: "For the avoidance of doubt if [Phoenix] does not achieve at least $[redacted] in 2024 ARR, then no Earnout Payment shall be due hereunder."[10]

The SPCA contains certain dispute resolution provisions relating to the Earnout Payments and a procedure for submitting disputes to an "Accounting Firm."[11] Those provisions are set forth in Analysis Section D below.[12]

---

[8] *Id.* § 1.1, at p. 3. The definition of 2024 ARR continues to define "Monthly Recurring Revenue" as meaning "with respect to any month, all recurring subscription revenue, including, but not limited to, all licensing and maintenance (support) fees and fees relating to third party products, attributable to Business Products sold or licensed by [Phoenix]" but excluding "any one-time or non-recurring payments." *Id.*

[9] *Id.* § 2.4(a).

[10] *Id.* § 2.4(b).

[11] *See id.* §§ 2.2(c), 2.4(a).

[12] *See infra* § IV.D.

5

### C. PLAINTIFF MONICA NEGOTIATES A CUSTOMER CONTRACT, RELYING ON ASSURANCES FROM DEFENDANT THAT IT WOULD BE INCLUDED IN THE EARNOUT CALCULATION

Following the sale of Phoenix to Defendant, Plaintiff Monica served as Delta Data's VP of Business Development.[13] In that role, Monica sought to acquire a new customer to which Delta Data would license its software and sell related services (referenced in the complaint as the "Customer").[14] The Customer requested that Delta Data begin providing services but that the Customer defer payment until a later date.[15] Monica told Delta Data's Chief Revenue Officer, Brett Bange, that this request was unreasonable from the perspective of Delta Data's business.[16] He also expressed concern that the delay in payment could cause the contract to not count toward 2024 ARR such that the threshold for the Earnout Payment would not be met.[17] Specifically, even if the contract was entered in 2024, it would not count toward 2024 ARR unless "an initial payment" was "made on or prior to March 31, 2025."[18] Monica proposed that he would tell the Customer that Delta Data could

---

[13] Compl. ¶ 20.

[14] *Id.* ¶¶ 18, 20.

[15] *Id.* ¶ 19.

[16] *Id.* ¶ 20.

[17] *Id.*

[18] *See* SPCA § 1.1(iv), at p. 3.

only agree to delay the initial quarterly payment if the Customer paid certain other fees upfront.[19]

In response, Bange raised that he wanted the contract signed by the close of Delta Data's fiscal year at the end of September 2024 to achieve certain financial quotas.[20] Bange told Monica that Delta Data would agree to count the Customer contract as 2024 ARR even if payment was received after March 31, 2025, as long as the Customer signed the contract by the end of September 2024.[21] Delta Data's CEO, Cameron Routh, "made the same promise to . . . Monica."[22] Based on those promises, Monica ceased his efforts to require the Customer to make an earlier payment.[23]

Delta Data and the Customer then entered a Master Services License Agreement, dated September 30, 2024 (the "MSLA"), which included "the unusually delayed payment arrangement."[24] Under the MSLA, the Customer's

---

[19] Compl. ¶ 21.

[20] *Id.* ¶ 22.

[21] *Id.* ¶ 23.

[22] *Id.*

[23] *Id.* ¶ 24.

[24] *Id.* ¶¶ 17, 24.

payments were to begin on "the earlier of (i) June 1, 2025, or (ii) the Acceptance Date as defined in Section 5 of the [MSLA]."[25]

MSLA Section 5(a)-(b) provided that if the Customer did not provide notice of any "Errors" within 30 days of delivery of Delta Data's software, then 30 days from such delivery would be the "Acceptance Date." Specifically, those sections provided:

> (a)    Except as otherwise specified in the License Schedule, [Customer] shall have a period of thirty (30) days commencing on the Delivery Date stated in the initial License Schedule executed by the parties (the "Test Period") to test the Software to determine whether it performs in the Operating Environment and substantially in accordance with the Documentation (collectively "Acceptance Criteria").

> (b)    During the Test Period, [Customer] shall notify Delta Data, in writing, of any Errors in the Software which cause the Acceptance Criteria not to be met. If after expiration of the Test Period Delta Data has not received any written notice of Errors from [Customer], the Software shall be deemed accepted by the [Customer] as of the last day of the Test Period which shall be the Acceptance Date.[26]

---

[25] Compl. Ex. B (hereinafter "MSLA"), Ex. A – License Schedule § 3; Compl. ¶ 25.

[26] MSLA § 5(a)-(b).

MSLA Section 5(d) provided another means by which the Acceptance Date could arrive: if the Customer used the software for two consecutive business days. That section reads, in part:

> (d) Notwithstanding anything to the contrary, if [Customer] uses the Software in a production environment, to process transactions for two (2) consecutive business days then the Software will be deemed to be accepted without the requirement of a writing. The date of the second consecutive business day the Software is used in production shall be the Acceptance Date.[27]

### D. DEFENDANT UNDERMINES PROMPT PAYMENT BY THE CUSTOMER TO AVOID THE EARNOUT PAYMENT

Plaintiffs allege that Delta Data delivered the software to the Customer on December 23, 2024.[28] They also allege that 30 days passed without the Customer "report[ing] any problems with the software."[29] Accordingly, Plaintiffs allege that under MSLA Sections 5(a)-(b), the Acceptance Date, on which payments were to begin, was January 22, 2025.[30]

---

[27] *Id.* § 5(d).

[28] Compl. ¶ 27.

[29] *Id.* ¶ 29.

[30] *Id.* ¶¶ 25, 29.

Delta Data invoiced the Customer on January 28, 2025, and the next day informed the Customer that payment was due.[31] The Customer had until March 29, 2025, sixty days from receipt of the invoice, to make payment.[32]

Delta Data "did not make any attempt to timely collect the payment."[33] Instead, it "t[old] the Customer that it would void the invoice and that the Customer did not need to pay."[34] Plaintiffs allege that this "was both inconsistent with Delta Data's contract with the Customer and inconsistent with Delta Data's own practices with respect to other clients."[35] They also allege that Defendant took this course of action in an "attempt to manipulate 2024 ARR" so that Plaintiffs would not receive the Earnout Payment.[36]

In the meantime, Defendant also had "terminated . . . Monica without cause."[37] Plaintiffs allege that Defendant did so "to ensure that [Monica] could not participate

---

[31] *Id.* ¶ 30.

[32] *Id.*; *see also* MSLA, Ex. A – License Schedule § 3 (providing that Customer "shall pay the first quarterly invoice within sixty (60) days of receipt thereof").

[33] Compl. ¶ 31.

[34] *Id.*

[35] *Id.* ¶ 32.

[36] *Id.*

[37] *Id.* ¶ 28.

10

in the performance of Delta Data's contract with the Customer and the collection of the Customer's first payment."[38]

Ultimately, the Customer did not pay by March 31, 2025.[39] Plaintiffs allege that "[t]he only reason" it did not do so is because Delta Data told the Customer it would void the invoice and that the Customer did not need to pay.[40] Plaintiffs further allege that "[i]f Delta Data had timely collected the Customer's payment, Delta Data's 2024 ARR would have surpassed the Earnout Payment threshold, entitling Plaintiffs to an Earnout Payment."[41]

Plaintiffs demanded that Defendant make the Earnout Payment, and Defendant refused.[42]

E.    PROCEDURAL HISTORY

Plaintiffs filed the complaint in May 2025, asserting five counts. In Counts I and II, Plaintiffs allege Defendant breached the SPCA and the implied covenant therein by undermining collection of the Customer payment to avoid the Earnout Payment.[43] In Count III, Plaintiffs allege Defendant defrauded them by falsely

---

[38] *Id.* ¶ 36.

[39] Compl. ¶ 34.

[40] *Id.*

[41] *Id.* ¶ 30.

[42] *Id.* ¶¶ 38-39.

[43] *Id.* ¶¶ 41-49.

promising that the Customer contract would count toward the Earnout Payment threshold even if payment was made after the time required by the SPCA.[44] Count IV is for punitive damages related to the fraud claim[45] and Count V for recovery of litigation expenses under the terms of the SPCA.[46]

Defendant moved to dismiss under Rule 12(b)(6) for failure to state a claim, as well as under Rule 12(b)(1) or 12(b)(3) on grounds that the SPCA requires alternative dispute resolution.[47] Plaintiffs filed an answering brief,[48] and Defendant filed a reply.[49]

## III.  STANDARDS OF REVIEW

### A.  RULE 12(B)(6) – FAILURE TO STATE A CLAIM

Upon a Rule 12(b)(6) motion, the Court: (i) accepts all well-pleaded factual allegations as true; (ii) credits vague allegations if they give the opposing party notice of the claim; (iii) draws all reasonable inferences in favor of the non-moving

---

[44] *Id.* ¶¶ 50-55.

[45] Compl. ¶¶ 56-59.

[46] *See id.* ¶¶ 60-63.

[47] *See generally* D.I. 4, Opening Br. in Support of Def.'s Mot. to Dismiss Pls.' Compl. (hereinafter "Op. Br.").

[48] *See generally* D.I. 11, Pls.' Ans. Br. in Opp'n to Def.'s Mot. to Dismiss Compl. (hereinafter "Ans. Br.").

[49] *See generally* D.I. 19, Reply Br. in Support of Def.'s Mot. to Dismiss Pls.' Compl. (hereinafter "Reply").

party; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[50]

The Court does not, however, accept conclusory allegations unsupported by the facts

or draw unreasonable inferences in favor of the nonmovant.[51]

**B.      RULE 12(B)(1) OR 12(B)(3) – LACK OF JURISDICTION OR IMPROPER VENUE DUE TO AGREEMENT TO ALTERNATIVE DISPUTE RESOLUTION**

Courts adjudicate motions to dismiss in favor of contractual alternative

dispute resolution under either Rule 12(b)(1) or Rule 12(b)(3).[52]  Under either rule,

"the court is not shackled to the plaintiff's complaint and is permitted to consider

---

[50] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldg., LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002)).

[51] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010)).

[52] *Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 343 (Del. Ch. 2023) (citing examples), *aff'd*, 326 A.3d 369 (Del. 2024) (TABLE).  Because "[a] motion to dismiss in favor of arbitration challenges the forum in which suit was filed," *id.*, the most straightforward rule to apply to such a motion is Rule 12(b)(3) governing a defense of improper venue.  Courts may also apply Rule 12(b)(1), governing lack of subject matter jurisdiction.  *See id.* at 345.  This requires recognizing a "flexible role" of Rule 12(b)(1), because an arbitration provision "does not deprive a court of subject matter jurisdiction." *Id.* at 343-45.  For a pleading stage motion, there is no practical difference in applying one rule as opposed to the other.  *See id.* at 342-43 (explaining that the "practical benefit" of applying Rule 12(b)(1) is that a litigant can bring it at any point in the case, whereas Rule 12(b)(3) can be raised only at the outset).

extrinsic evidence from the outset."[53]  "The burden is on the non-movant" to establish that this Court should properly adjudicate the claims.[54]

## IV.  ANALYSIS

Ordinarily, this Court analyzes the threshold question of whether a contract requires alternative dispute resolution before reaching the merits and addresses breach of contract claims before turning to the implied covenant.  Here, however, the Court reverses that order in both respects.  That is because the threshold question is more easily understood with background on the merits[55] and because Plaintiffs' breach of contract theory depends on the implied covenant.

In what follows, the Court holds, first, that Plaintiffs' contractual claims may proceed; second, that their fraud claim must be dismissed; and third, that their remedy-related claims follow the contract and fraud rulings.  Last, the Court

---

[53] *Sylebra Cap. P'rs Master Fund, Ltd. v. Perelman*, 2020 WL 5989473, at *9 (Del. Ch. Oct. 9, 2020) (quoting *In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018)) (applying Rule 12(b)(3)); *Dolce v. WTS Int'l, LLC*, 2024 WL 714128, at *3 (Del. Ch. Feb. 20, 2024) ("In deciding a 12(b)(1) motion to dismiss, the court may consider documents outside the complaint." (quoting *Wildfire Prods., L.P. v. Team Lemieux LLC*, 2022 WL 2342335, at *3 (Del. Ch. June 29, 2022))).

[54] *See Dolce*, 2024 WL 714128, at *3 (citing *Wildfire Prods.*, 2022 WL 2342335, at *3).

[55] Defendant also saved its argument that this dispute was "brought in the wrong forum" for last, *see* Op. Br. at 1, 28-32; Reply at 16-23, and Plaintiff addressed it last as well, *see* Ans. Br. at 30-33.

concludes that the remaining claims need not be referred to alternative dispute resolution and may instead proceed in this Court.

### A. THE COMPLAINT STATES CLAIMS FOR BREACH OF THE SPCA, UNDER BOTH IMPLIED COVENANT AND PREVENTION DOCTRINE THEORIES.

The parties' dispute over the Earnout Payment turns on whether one customer contract, the MSLA, counts toward the financial threshold triggering payment. There is no dispute that, under the SPCA's express terms, the MSLA would not count toward the Earnout Payment threshold. The parties agree that for a contract to count, an initial payment must have been made on or before March 31, 2025, and an initial payment on the MSLA was not made by that date.[56] Thus, Plaintiffs do not point to the express Earnout Payment terms to argue that there has been a breach. Nor do Plaintiffs point to an express term governing Defendant's conduct relating to the collection of invoices.[57] Instead, Plaintiffs invoke the implied covenant and the contractual "prevention doctrine."[58]

---

[56] *See* Op. Br. at 1-2; Ans. Br. at 21-22 (contending that the Earnout Payment conditions were satisfied "except for the portion of revenue" from the MSLA); Compl. ¶ 34 (alleging that "the Customer did not pay Delta Data by March 31, 2025").

[57] *See* Ans. Br. at 11 ("[T]he SPCA is silent on the issue of how Defendant was required to act in the normal course when collecting payments and otherwise enforcing the Company's rights under the contracts that it signed with its customers.").

[58] *See* Ans. Br. at 10-23; *Snow Phipps Grp., LLC v. KCAKE Acquisitions, Inc.*, 2021 WL 1714202, at *52-55 (Del. Ch. Apr. 30, 2021) (discussing the "prevention doctrine" invoked by Plaintiffs).

Defendant contends that Plaintiffs' concessions doom their claims. According to Defendant, permitting these claims to proceed would grant Plaintiffs contractual protections they did not secure at the bargaining table and would credit Plaintiffs' unreasonable expectation of an Earnout Payment.[59]

Plaintiffs have pled facts from which it can be inferred that Defendant took affirmative acts for the purpose of thwarting the Earnout Payment. As pled, those affirmative acts were contrary to Plaintiffs' reasonable expectations at the time they negotiated the SPCA. Accordingly, this is a rare case where the implied covenant is properly invoked. And under the prevention doctrine, Plaintiffs' breach of contract claim can proceed as well.

**1. PLAINTIFFS STATE AN IMPLIED COVENANT CLAIM BECAUSE THEY ALLEGE DEFENDANT TOOK AFFIRMATIVE ACTS FOR THE PURPOSE OF AVOIDING THE EARNOUT PAYMENT.**

"The implied covenant of good faith and fair dealing inheres in every contract and ensures that neither party acts arbitrarily or unreasonably to frustrate the fruits of their bargain."[60] The implied covenant "embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject

---

[59] *See* Op. Br. at 11-12, 14-15, 16-20.

[60] *Johnson & Johnson v. Fortis Advisors LLC*, --- A.3d ----, 2026 WL 89452, at *15 (Del. Jan. 12, 2026) (first citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005); then citing *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); and then citing *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017)).

matter of the contract.'"[61] It is "a judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties."[62]

The implied covenant "is, by definition, implied" and "protects the spirit of the agreement rather than the form."[63] But it is a "cautious enterprise," a "limited and extraordinary legal remedy" that will not be used to "rebalanc[e] economic interests after events that could have been anticipated, but were not"[64] or "as a backstop to imply terms that parties failed to include but which could easily have been drafted."[65] Rather, the implied covenant will apply only when "the contract is 'truly silent' about the issue" and its "express terms . . . naturally imply certain corresponding conditions."[66] Stated another way, the contract must contain a

---

[61] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (quoting *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)).

[62] *Id.* at 1116-17 (quoting *Amirsaleh v. Bd. of Trade of City of N.Y.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009)).

[63] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014) (quoting *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE)).

[64] *Johnson & Johnson*, 2026 WL 89452, at *17, *21 (quoting *Nemec*, 991 A.2d at 1125, 1128).

[65] *Baldwin*, 283 A.3d at 1117 (citations omitted).

[66] *Id.* (quoting *Dieckman*, 155 A.3d at 361).

17

"gap[]," and implying the term to fill that gap must be "necessary" to protect the parties' "reasonable expectations."[67]

To plead a breach of the implied covenant, a plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[68] The plaintiff bears the burden of proving that defendant "has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the [plaintiff] reasonably expected."[69] The Court must analyze "whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose."[70]

Here, Plaintiffs plead a breach of the implied covenant. As an initial matter, Plaintiffs plead that there was a gap to fill. The SPCA provides an Earnout Payment conditioned on, among other things, when initial customer payments are made. For those payments to be made, Defendant had to collect, or at least accept, them. Defendant agrees that the SPCA "is silent" on the issue of how it was required to act when collecting payments and emphasizes that the SPCA contains no "efforts"

---

[67] *Id.* at 1116 (quoting *Dieckman*, 155 A.3d at 367).

[68] *Id.* at 1117-18 (quoting *Sheehan*, 2020 WL 2838575, at *11).

[69] *Id.* at 1118 (quoting *Dieckman*, 155 A.3d at 367).

[70] *Id.* (quoting *Amirsaleh*, 2009 WL 3756700, at *4).

18

clause in that regard.[71]  There is thus a "gap" regarding the range of actions Defendant either must or is prohibited from taking when it comes to collection of payments.[72]

Beyond pleading a gap, Plaintiffs plead an implied obligation that Defendant breached.  The complaint pleads that Defendant took affirmative acts to prevent the Customer from making payment on the MSLA for the purpose of undermining Plaintiffs' right to an Earnout Payment.  Specifically, Plaintiffs plead, after Delta Data had already invoiced the Customer for payment due on March 29, 2025, Defendant "t[old] the customer that it would void the invoice and that the Customer did not need to pay."[73]  The complaint alleges that Defendant took this action for the purpose of "manipulat[ing] 2024 ARR," thus undermining Plaintiffs' right to an

---

[71] *See* Reply at 7-8 (quoting Ans. Br. at 11); Op. Br. at 17.  The lack of an "efforts" clause here also distinguishes this case from the Supreme Court's recent *Johnson & Johnson* decision, which reversed a post-trial ruling that an acquiror breached the implied covenant.  *See Johnson & Johnson*, 2026 WL 89452, at *1.  There, unlike here, there was no gap regarding the actions the acquiror must or must not take to achieve earnouts because the merger agreement contained a "commercially reasonable efforts" provision that "expressly permitted" it to "calibrate its efforts in light of" developments that later occurred.  *See id.* at *19.

[72] Despite agreeing that the contract is silent on the issue, Defendant characterizes its argument as contending that there is no gap.  *See, e.g.*, Op. Br. at 2, 15, 17.  That characterization appears to conflate two questions: (1) Is there a gap? (2) Is Plaintiff seeking to imply a term that is appropriate to fill that gap?  Though those questions may sometimes overlap, in the interests of clarity, it is best to separate them where possible.  The second question is addressed in the paragraphs that follow.

[73] *See* Compl. ¶ 31.

Earnout Payment.[74]  Plaintiffs also plead that Defendant terminated Monica "to ensure that he could not participate in the performance of Delta Data's contract with the Customer and the collection of the Customer's first payment."[75]  The parties agreed to an Earnout Payment contingent on Delta Data receiving certain customer payments prior to March 31, 2025.  When Plaintiffs entered that agreement, it was reasonable for them to expect at least that Delta Data would not take affirmative acts to avoid receiving customer payments by that date.[76]  By pleading that Delta Data took such acts for the purpose of undermining the Earnout Payment, Plaintiffs allege a breach of the implied covenant.

This result is consistent with the Court of Chancery's guidance in *Winshall v. Viacom International Inc.*[77]  The court there held that plaintiff failed to allege a breach of the implied covenant where defendants failed to take an opportunity to

---

[74] *Id.* ¶ 32.

[75] *Id.* ¶ 36.

[76] Defendant argues that the implied covenant claim fails because it "is never reasonable for a party to expect an earnout payment."  Op. Br. at 18.  Setting aside whether this broad statement is accurate, Plaintiffs do not allege that their reasonable expectation was the "realization of the Earnout itself."  *Id.* (quoting *S'holder Representative Servs. LLC v. Albertsons Cos.*, 2021 WL 2311455, at *10 (Del. Ch. June 7, 2021)).  Rather, Plaintiffs allege that they reasonably expected that "Delta Data would not deviate from company practices related to invoicing and collection of payment," such as by telling the Customer it would void the invoice and that it did not have to pay.  *See* Compl. ¶¶ 34-35, 48.

[77] 55 A.3d 629 (Del. Ch. 2011) (Strine, C.), *aff'd*, 76 A.3d 808 (Del. 2013).

renegotiate a third-party contract in a way that would have increased an earnout payment.[78] In so holding, the court explained that there was a "critical difference" between the defendants' actions, which did not breach the implied covenant, and the "actions of an acquiror who promises earn-out payments to the sellers of the target business and then purposefully pushes revenues out of the earn-out period," which would breach the implied covenant.[79] Here, Plaintiffs do not allege that Defendant merely failed to take an opportunity; they plead Defendant took deliberate action to push the MSLA outside of the Earnout Payment period, like the actions the *Winshall* court noted would support a claim. Additional case law, finding implied covenant claims adequately pled where plaintiffs alleged defendants took affirmative acts to undermine plaintiffs' contractual benefits, is in accord.[80]

---

[78] *See id.* at 637-38.

[79] *Id.* at 638.

[80] *See Am. Cap. Acquisition P'rs, LLC v. LPL Hldgs., Inc.*, 2014 WL 354496, at *7-8 (Del. Ch. Feb. 3, 2014) (denying motion to dismiss where defendants "affirmatively act[ed] to gut [the acquired company]" by "'pivot[ing]' sales" to another of acquiror's subsidiaries, in order to "minimize payments under the [relevant contracts]"); *see also Dieckman*, 155 A.3d at 367-68 (holding implied covenant well-pled where defendant "act[ed] to undermine the protections afforded to unitholders" by "voluntarily issu[ing] a proxy statement" with misleading statements to immunize itself from those protections).

Plaintiffs' allegations of Defendant's affirmative acts also distinguish *Limitless Coffee, LLC v. Mott's, LLP*,[81] on which Defendant relies heavily.[82] There, this Court found no implied covenant breach where defendant failed to take "commercially reasonable actions" to promote the sale of plaintiff's products and reach an earnout.[83] The alleged breach was thus based on defendant's inaction—the failure to promote plaintiff's products—rather than on defendant's affirmative acts to undermine the earnout. Even if, absent an "efforts" clause in the SPCA, Plaintiffs could not have reasonably expected Delta Data to make specific efforts to collect payments, Plaintiffs were reasonable to expect at least that Delta Data would refrain from affirmatively acting to avoid them.

Based on the well-pled facts in the complaint, which the Court must credit at this stage, Plaintiffs have pled an implied covenant claim. With the benefit of a record, Defendant will have a chance to offer its own version of the facts.[84] That includes Defendant's contention that there is an alternative reading of the MSLA

---

[81] 2024 WL 4233900 (Del. Super. Sept. 19, 2024).

[82] *See* Op. Br. at 17; Reply at 7-8.

[83] *Limitless Coffee*, 2024 WL 4233900, at *3-4.

[84] *See In re Morrow Park Hldg. LLC*, 2020 WL 3415649, at *19 (Del. Ch. June 22, 2020) (explaining that "application of the implied covenant is 'rare and fact-intensive' and 'turn[s] on issues of compelling fairness,'" and denying summary judgment (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998))).

under which the Customer may not have been obligated to pay until a later date.[85]

Defendant has not shown that Plaintiffs' reading of that contract is unreasonable, so Plaintiffs' allegations control at this stage.[86] That also includes Defendant's argument that Plaintiffs' "claim is based on conjecture" about what the Customer might have done if events unfolded differently.[87] Plaintiffs' claim is based on well-pled facts about Defendant's conduct and reasonable inferences that follow, which the Court must accept.[88]

---

[85] *See, e.g.*, Op. Br. at 8, 13-14, 19; Reply at 8-9.

[86] *See LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1146 (Del. 2025) ("A motion to dismiss can only be granted when the moving party's interpretation is the *only* reasonable interpretation."). Plaintiffs' interpretation of the MSLA is at the very least a reasonable one. Section 5(a)-(b) provides that if Delta Data has not received written notice of "Errors" after the "Test Period," then the last day of that 30-day Test Period "shall be the Acceptance Date." MSLA § 5(a)-(b). Defendant appears to contend that the Acceptance Date does not occur unless the requirements of Section 5(d) are also met. But on its face, nothing in Section 5(d) indicates that it imposes extra requirements, beyond those in Section 5(a)-(b), for the Acceptance Date to occur. It is at least reasonable to read Section 5(d) as an alternative means for Delta Data to assert the Acceptance Date has occurred—i.e., as ensuring that, even if the Customer delivered written notice of Errors, the Acceptance Date would be triggered if the Customer proceeded with using the Software in a production environment despite those Errors.

[87] *See* Op. Br. at 18.

[88] For example, Plaintiffs allege Delta Data "t[old] the Customer that it would void the invoice [requiring payment by March 29, 2025] and that the Customer did not need to pay" and that is why the Customer did not pay by March 31, 2025. Compl. ¶¶ 30-31, 34. What Delta Data told the Customer is a well-pled fact, and it is reasonable to infer that the Customer did not pay by the invoice due date because Delta Data told it that it did not need to.

23

Last, Defendant contends that the Court should dismiss the implied covenant claim as "duplicative" of the breach of contract claim.[89] Courts dismiss implied covenant claims as "duplicative" where "the contract at issue expressly addresses" the matter.[90] That is based on the rule that "express contractual provisions 'always supersede' the implied covenant"[91] and the requirement that there must be a "gap" for the implied covenant to fill.[92] As explained above, the contract here does not expressly address the matter of how Defendant must conduct itself regarding collection of payments. Accordingly, the implied covenant may apply to fill that gap, and the claim may proceed.

Defendant's motion to dismiss Count II is denied.

### 2. PLAINTIFFS' BREACH OF CONTRACT CLAIM MAY PROCEED UNDER THE PREVENTION DOCTRINE.

In addition to invoking the implied covenant, Plaintiffs bring a claim for breach of contract. As explained above, Plaintiffs acknowledge that one condition to the Earnout Payment was not met because payment on the MSLA was not "made

---

[89] *See* Op. Br. at 15, 20.

[90] *See, e.g.*, *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (citing *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *12 (Del. Ch. Dec. 22, 2010)).

[91] *See Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *22 (Del. Ch. Oct. 7, 2019) (citations omitted).

[92] *Haney v. Blackhawk Network Hldgs., Inc.*, 2016 WL 769595, at *9 (Del. Ch. Feb. 26, 2016) (citation omitted).

on or prior to March 31, 2025."[93]  Based on Delaware's "contractarian" bent,[94] it would be understandable to conclude that Plaintiffs' acknowledgement spells the end of their breach of contract claim.

Delaware courts, however, will excuse the non-occurrence of contractual conditions where the "prevention doctrine" applies.[95]  Under that doctrine—which Delaware courts apply consistent with the Restatement (Second) of Contracts[96]— "[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[97]  To give rise to the prevention doctrine, a defendant's conduct must itself "constitute[] a breach."[98]

---

[93] *See* SPCA § 1.1, at p. 3; Ans. Br. at 21-22.

[94] *See Thompson St. Cap. P'rs IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1165-66 (Del. 2025) (quoting *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024)).

[95] *See, e.g., Snow Phipps*, 2021 WL 1714202, at *52-55 (Del. Ch. Apr. 30, 2021); *WaveDivision Hldgs., LLC v. Millenium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *14-15 & n.110 (Del. Ch. Sept. 17, 2010).

[96] *See In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90 (Del. Ch. Aug. 31, 2020) (citing *Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017); *WaveDivision*, 2010 WL 3706624, at *14-15), *aff'd*, 251 A.3d 1015 (Del. 2021) (TABLE).

[97] *WaveDivision*, 2010 WL 3706624, at *14 (quoting Restatement (Second) of Contracts § 245 (Am. Law Inst. 1981)).

[98] *Anthem-Cigna*, 2020 WL 5106556, at *92 (quoting Restatement (Second) of Contracts § 245 cmt. a).

Here, as previously explained, the complaint pleads that Defendant's own conduct caused the Customer not to pay before March 31, 2025, which prevented Delta Data from reaching the Earnout Payment threshold.[99] The complaint also pleads that conduct breached the implied covenant, which is sufficient to trigger the prevention doctrine.[100] Accordingly, Plaintiffs' breach of contract claim may proceed. Defendant's motion to dismiss Count I is denied.[101]

---

[99] *See supra* § IV.A.1.

[100] *Anthem-Cigna*, 2020 WL 5106556, at *91 (explaining that the breach may be "either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court" and noting that one of the Restatement's illustrations involves an obligation that "flowed from the implied covenant" (quoting Restatement (Second) of Contracts § 245 cmt. a)). Although Defendant has argued that the implied covenant claim and breach of contract claim are duplicative, it has not sought dismissal of the breach of contract claim on that basis. In any event, permitting these two claims to proceed past the pleading stage presents little practical concern: Plaintiff has conceded that they are pled in the alternative (*see* Ans. Br. at 20), meaning they will not provide a basis for duplicative damages. *See Firmenich Inc. v. Nat'l Flavors, Inc.*, 2020 WL 1816191, at *9 (Del. Super. Apr. 7, 2020) (explaining that claims pled in the alternative will "never co-exist at final judgment" and thus will not provide a basis for a "rehash of the same damages" (quoting *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2018 WL 3084975, at *14-15 (Del. Super. June 21, 2018))).

[101] In their answering brief, Plaintiffs in passing suggest that Defendant breached another contract: an oral contract formed when Defendant's principals told Plaintiff Monica that they would count the MSLA toward 2024 ARR if it was signed by the end of September 2024. Ans. Br. at 23. While those facts form the basis for Plaintiffs' fraud claim, analyzed below, the only contract the complaint alleges Defendant breached was the SPCA. *See* Compl. ¶¶ 33, 41-44. Thus, to the extent Plaintiffs now seek to assert a claim for breach of a contract other than the SPCA, that claim is dismissed.

### B. PLAINTIFFS FAIL TO STATE A FRAUD CLAIM BECAUSE THEY DO NOT PLEAD FACTS SUFFICIENT TO INFER THE SPEAKERS' INTENT.

Moving beyond contractual theories, Count III is a claim for fraud. Plaintiffs allege that two of Defendant's principals told Plaintiff Monica that Defendant would count the MSLA toward the Earnout Payment threshold even if an initial payment was not made by March 31, 2025, as long as the MSLA was signed by the end of September 2024.[102] This was fraud, Plaintiffs contend, because Defendant had no intention of keeping that promise.[103] Unlike their contract-based claims, Plaintiffs fraud claim is not well-pled. That is because the complaint lacks allegations sufficient to meet the stringent standard for promissory fraud.

Rule 9(b) heightens the pleading standard for fraud.[104] It requires that, except for defendants' state of mind, "the circumstances constituting fraud . . . shall be stated with particularity."[105] Subject to this heightened standard, "[t]o state a claim for fraud, a plaintiff must allege: (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or

---

[102] *See* Compl. ¶¶ 23, 51-55.

[103] *See* Ans. Br. at 26-27.

[104] *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) (citing Super. Ct. Civ. R. 9(b)).

[105] *Id.* (quoting Super. Ct. Civ. R. 9(b)).

refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance."[106]

For fraud claims based on "promises of future performance"—often called "promissory fraud"—Delaware courts heighten the pleading standard further.[107] Fraud claims are most straightforward when they are based on statements about "a past or contemporaneous fact" that is external to the speaker.[108] For such a claim, a plaintiff may aver the speaker's state of mind "generally."[109] By contrast, Delaware courts "look[] with particular disfavor" at claims of promissory fraud.[110] One reason is that such claims turn on the speaker's intent at the time of the promise, "which is generally difficult to prove or disprove because there may be no readily observable, objective, external fact with which to divine" it.[111] Accordingly, Delaware courts impose "an even higher threshold" for promissory fraud: "the plaintiff 'must plead specific facts that lead to a reasonable inference that the promisor had no intention

---

[106] *Id.* (citing *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015)).

[107] *See Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *9-10 (Del. Ch. Dec. 23, 2008); *see also, e.g.*, *CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080, at *17-18 (Del. Ch. June 29, 2022).

[108] *See Winner Acceptance*, 2008 WL 5352063, at *7 (citations omitted).

[109] *Id.* at *10.

[110] *Id.* at *9.

[111] *Id.* at *10.

of performing at the time the promise was made.'"[112]  Merely pleading that the party "fail[ed] to keep [the] promise" is insufficient.[113]

The alleged false statements in this case are promises of future performance. They promised that if, in the future (relative to when the statements were made), the Customer signs the MSLA before the end of September 2024, then Defendant would count the MSLA as 2024 ARR.[114]  Accordingly, to survive a motion to dismiss, Plaintiffs must plead specific facts that the speakers had no intention of honoring that promise at the time they made it.

Plaintiffs fail to meet this high burden.  They plead facts about what the statements were, who made them, and other circumstances surrounding them.[115]  But they do not plead specific facts from which it could be inferred that, at the time the promise was made, Bange and Routh (or anyone else at Delta Data) had no intention of keeping it.  On state of mind, Plaintiffs plead that Bange and Routh were motivated to get the MSLA signed before the end of September 2024, as well as that they later tried to avoid triggering the Earnout Payment and ultimately did not keep

---

[112] *MicroStrategy Inc. v. Acacia Res. Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010) (first citing *Winner Acceptance*, 2008 WL 5352063, at *10; and then quoting *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009)).

[113] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *9 (Del. Ch. Aug. 30, 2019) (quoting *Grunstein*, 2009 WL 4698541, at *13).

[114] *See* Compl. ¶¶ 21-23.

[115] *See* Ans. Br. at 24-25 (compiling such allegations).

their promise.[116] But those allegations are as consistent with an intent to perform at the time of the promise as they are with an intent not to perform, and they thus are insufficient to meet the stringent burden to plead promissory fraud.[117]

Seeking a different result, Plaintiffs cite *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, where the Court sustained a promissory fraud claim related to failure to fund an earnout.[118] But in *TrueBlue*, unlike here, the plaintiff alleged that defendant "did not intend to perform on the promises at the time they were made" and "indicated it intended to repudiate" them.[119] Moreover, the Court in *TrueBlue* based its holding on the principle that "less particularity is required when the facts

---

[116] *See* Compl. ¶ 22 (alleging Bange was "concern[ed] about the importance of signing up the Customer by September 30, 2024"), ¶ 31 (alleging Delta Data later made efforts to avoid receiving payment from the Customer to avoid the Earnout Payment), ¶ 36 (alleging Delta Data later terminated Monica so that he could not participate in collecting payment from the Customer), ¶ 39 (alleging Delta Data refused to make the Earnout Payment).

[117] *See Hiller & Arban, LLC v. Reserves Mgmt., LLC*, 2016 WL 3678544, at *5 (Del. Super. July 1, 2016) (dismissing promissory fraud claim based on alleged failure to perform because such failure "is as consistent with an honest intent as with a dishonest one" (quoting *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001))).

[118] 2015 WL 5968726, at *6-7, *10 (Del. Super. Sept. 25, 2015); Ans. Br. at 25-27.

[119] *See* First Am. Compl. ¶ 53, *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, C.A. No. N14C-12-112 WCC CCLD (Del. Super. Jan. 16, 2015); *TrueBlue*, 2015 WL 5968726, at *6 ("Plaintiffs further allege [defendant] did not intend to perform on the promises at the time they were made . . . .").

30

lie more in the knowledge of the opposing party than of the pleading party."[120] That principle makes good sense in most fraud cases, where knowledge can be pled generally, but not for promissory fraud. As noted above, one of the bases for heightening the pleading standard in promissory fraud cases is that there usually is no observable fact outside of the defendant's own mind from which to divine the defendant's intent.[121] As a basis for heightening the pleading standard in the first place, the fact that a speaker's intent "lie[s] more in the knowledge" of the speaker than the pleading party cannot then be the basis for lowering it.

Although the complaint's allegations might suffice for an ordinary fraud claim based on past or contemporaneous facts, they do not meet the heightened standard for promissory fraud. Count III is therefore dismissed.[122]

---

[120] *TrueBlue*, 2015 WL 5968726, at *6 (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003)).

[121] *See Winner Acceptance*, 2008 WL 5352063, at *9-10.

[122] Because the Court's holding regarding promissory fraud is sufficient to dismiss Count III, the Court need not address Defendant's alternative argument under the justifiable reliance prong. *See* Op. Br. at 24-26.

**C.** **PLAINTIFFS' CONTRACTUAL INDEMNIFICATION COUNT MAY PROCEED WITH THEIR CONTRACT-BASED CLAIMS, WHILE THE PUNITIVE DAMAGES COUNT FALLS WITH THE FRAUD CLAIM.**

Counts IV and V seek remedies related to Plaintiffs' contract and fraud claims.[123] At this stage, both counts rise or fall along with the substantive claims with which they are associated.

In Count V, Plaintiffs seek interest payments and attorneys' fees and expenses under SPCA Section 6.2(c).[124] Defendant's only argument for dismissal of this count is that "Plaintiffs have failed to allege . . . breach of any representation, warranty, covenant, or agreement under the SPCA."[125] Because Plaintiffs plead breach of the SPCA and the implied covenant therein, Count V may proceed.

In Count IV, Plaintiffs seek punitive damages on their fraud claim.[126] Because the fraud claim is dismissed and Plaintiffs' contract-based claims could not warrant punitive damages,[127] Count IV is dismissed as well.[128]

---

[123] *See* Compl. ¶¶ 56-63.

[124] *See id.* ¶¶ 60-63.

[125] *See* Op. Br. at 28.

[126] *See* Compl. ¶ 58 (seeking punitive damages on basis that Defendant "acted with malice and reckless disregard when it fraudulently induced Mr. Monica to cease his efforts to obtain an upfront payment from the Customer").

[127] *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445-49 (Del. 1996).

[128] The Court thus need not address Defendant's alternative argument that other SPCA sections bar punitive damages. *See* Op. Br. at 27-28; Reply at 15-16.

**D.      THE SPCA DOES NOT REQUIRE THIS DISPUTE TO BE SUBMITTED TO AN ACCOUNTING FIRM.**

Last, in the alternative to its arguments for dismissal on the merits, Defendant argues that the complaint should be dismissed or stayed because the SPCA mandates that this dispute be resolved by an "Accounting Firm."[129]   For this contention, Defendant points to SPCA Sections 2.4(a) and 2.2(c).[130]

SPCA Section 2.4(a) lays out the circumstances in which Plaintiffs would receive an Earnout Payment.  It then provides: "If Sellers' Representative disputes the Earnout Payment, Buyer [defined to mean Defendant] and the Seller Parties [defined to mean Plaintiffs] shall use the procedures set forth in Section 2.2(c) to resolve such dispute."[131]

Section 2.2(c) provides procedures for Defendant to submit a "Closing Statement."[132]   It requires that Closing Statement to set forth "Closing Working Capital, Closing Cash, Closing Indebtedness, [and] Closing Transaction Expenses" from which the Closing Statement would calculate a "Cash Purchase Price."[133] Section 2.2(c) then provides procedures for resolving disputes about the Closing

---

[129] *See* Op. Br. at 1, 28-32.

[130] *See id.* at 29.

[131] SPCA § 2.4(a).

[132] *Id.* § 2.2(c)(i).

[133] *Id.*

Statement. Those procedures require Sellers' Representative to submit a "Notice of Disagreement" and, if unable to resolve their differences, require the parties to submit the dispute for resolution by an "Accounting Firm" as follows:

> Buyer and the Sellers' Representative shall submit to the Accounting Firm for review and resolution of all specific line items (but only such line items) that remain in dispute and were properly included in the Notice of Disagreement, as well as their respective calculations thereof . . . .

> Buyer and the Sellers' Representative shall instruct the Accounting Firm to make a final determination of the items included in the Closing Statement (to the extent such amounts are in dispute) in accordance with the guidelines and procedures set forth in [the SPCA]. Buyer and the Sellers' Representative shall reasonably cooperate with the Accounting Firm during the term of its engagement.

> Buyer and the Sellers' Representative shall instruct the Accounting Firm not to assign a value to any item in dispute greater than the greatest value for such item assigned by Buyer, on the one hand, or Sellers' Representative, on the other hand, or less than the smallest value for such item assigned by Buyer, on the one hand, or Sellers' Representative, on the other hand.

> Buyer and the Sellers' Representative shall also instruct the Accounting Firm to, and the Accounting Firm shall, make its determination based solely on presentations by Buyer and the Sellers' Representative that are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review).

> The Closing Statement and the resulting calculation of the Cash Purchase Price shall become final and binding on the Parties hereto on the date the Accounting Firm delivers its final resolution in writing to Buyer and the Sellers'

Representative . . . and absent manifest error such resolution by the Accounting Firm shall not be subject to court review or otherwise appealable.[134]

When evaluating an alternative dispute resolution provision, Delaware courts follow two steps: First, they determine whether the provision requires either an arbitration or an expert determination, which determines which principles they should apply in evaluating the provision. Second, they apply the principles called for by the first step.[135] The Court analyzes each step below.

### 1. THE ACCOUNTING FIRM PROVISION CALLS FOR AN EXPERT DETERMINATION.

Delaware courts differentiate between arbitrations and expert determinations.[136] Fundamentally, the difference is "in the type and scope of authority that is being delegated by the parties to the decision maker."[137] An expert is typically "limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation."[138] An arbitrator, by contrast, generally has "authority to decide all legal

---

[134] *Id.* (paragraph breaks added for readability).

[135] *See Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 617-19 (Del. 2023).

[136] *See Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 454-55, 460-61 (Del. Ch. July 9, 2018).

[137] *Terrell*, 297 A.3d at 618 (quoting *Penton*, 252 A.3d at 464).

[138] *Id.* (quoting *Penton*, 252 A.3d at 464).

and factual issues necessary to resolve the matter," "analogous to the powers of a judge in a judicial proceeding."[139]

Parties sometimes "state[] their intention explicitly" as to whether a particular dispute resolution mechanism is an arbitration or expert determination.[140] Where they have not done so, a court will "examine other aspects of the contract or even turn to extrinsic evidence."[141] A provision more likely calls for an arbitration if it "include[s] procedural rules affording each side the opportunity to present their case" and empowers the decisionmaker to issue "binding decision[s] on issues of law or legal claims."[142] It more likely calls for an expert determination when it contemplates a more informal procedure and empowers the decisionmaker to determine only a "disputed factual issue" that requires "specialized knowledge."[143]

Here, SPCA Section 2.2(c) is an expert determination provision. Although it provides a procedure for the parties to present their positions, that procedure is significantly less robust than afforded in a judicial proceeding. Section 2.2(c) states only that the parties shall submit to the Accounting Firm "all specific line items (but

---

[139] *Id.* (quoting *Penton*, 252 A.3d at 464).

[140] *Penton*, 252 A.3d at 462.

[141] *Id.*

[142] *See Terrell*, 297 A.3d at 618-19 (first quoting *Penton*, 252 A.3d at 464; and then citing *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *7 (Del. Ch. Jan. 29, 2019)).

[143] *See id.* at 618 (quoting *Penton*, 252 A.3d at 464).

only such line items) that remain in dispute . . . as well as their respective calculations thereof."[144] It does not specify any other "opportunity" for the parties to "present their case;"[145] while it references the parties' "presentations," it does not specify what else such presentations could include.[146] The Accounting Firm's determination relates to the assignment of "value" to the line items, which is a factual determination that draws on the core of an accounting firm's expertise, not a decision of law. The Accounting Firm procedure is thus an expert determination.

Because the SPCA does not call for an arbitration, the Court will not invoke "arbitral principles" to determine whether it applies.[147] Rather, the Court must rely upon its ordinary "contract interpretation principles."[148]

### 2. THE ACCOUNTING FIRM PROVISION DOES NOT APPLY TO THIS DISPUTE.

Under ordinary principles of contract law, the Accounting Firm provision does not apply to this dispute. As Defendant points out, SPCA Section 2.4(a), on its own, reads broadly in directing that "[i]f Sellers' Representative disputes the Earnout Payment, Buyer and the Seller Parties shall use the procedures set forth in Section

---

[144] SPCA § 2.2(c).

[145] *Terrell*, 297 A.3d at 618-19 (citing *Ray Beyond*, 2019 WL 366614, at *7).

[146] SPCA § 2.2(c).

[147] *See Penton*, 252 A.3d at 458-59 (citing *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *25 (Del. Ch. May 13, 2013)).

[148] *See Terrell*, 297 A.3d at 617.

2.2(c) to resolve such dispute."[149]  But that sentence cannot be read in a vacuum; it must be interpreted in the context of the procedures called for in Section 2.2(c).[150]

The procedures in Section 2.2(c) do not lend themselves to resolving this dispute.  Those procedures concern disputes about "assign[ing] a value" to "line items" and the "calculations" resulting from those values.[151]  Assigning value to specific line items is within an accounting firm's expertise and aligns with the procedures of submitting only such line items and calculations for resolution.[152]  Line items and calculations will be insufficient to resolve Plaintiff's claims; rather, the decisionmaker must apply the law to facts concerning, among other things,

---

[149] *See* Reply at 16-17 (emphasis omitted) (quoting SPCA § 2.4(a)).

[150] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.").

[151] SPCA § 2.2(c).

[152] At oral argument, Defendant contended that the procedure of reviewing line items does not apply to disputes about the Earnout Payment.  But Section 2.4(a) refers to "the procedures set forth in Section 2.2(c)," and the only "procedures" in Section 2.2(c) are those relating to specific line items.  If Defendant's argument were accepted, this dispute would be referred to the Accounting Firm without any procedures for it to apply.  The better reading of these provisions is that they require disputes about the Earnout Payment to be submitted to the Accounting Firm when those disputes are amenable to resolution through the procedures Section 2.2(c) does provide.  Defendant's point that the procedures in Section 2.2(c) do not apply to this dispute only underscores that the parties did not intend disputes of this sort to be resolved through those procedures.

Defendant's conduct, which is outside the Accounting Firm's expertise.[153] Defendant tacitly recognizes this in arguing that this case is an accounting dispute when it is "[s]tripped of its improper claims."[154] Because some of the purportedly "improper" legal claims survive, directing them to an Accounting Firm would grant that expert "broader and deeper authority than that reasonably expected by the parties."[155]

Based on a plain reading of the SPCA, the Court concludes that the parties did not intend for the Accounting Firm to resolve this dispute. Accordingly, the complaint's remaining claims may proceed in this Court.

---

[153] *See Penton*, 252 A.3d at 466 (explaining that experts are normally "not granted . . . the authority to make binding decisions on general issues of law or legal disputes" (citation omitted)).

[154] Op. Br. at 29.

[155] *See Chi. Bridge*, 166 A.3d at 931 n.81 (citation omitted).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss under Rule 12(b)(6) is **DENIED** as to **Counts I, II, and V** and **GRANTED** as to **Counts III and IV**. Defendant's motion to dismiss or stay under Rule 12(b)(1) and 12(b)(3) is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**